**GULF PRODUCTION CO. et al. v. STATE et al. (No. 6532.)**

(Court of Civil Appeals of Texas. San Antonio. April 30, 1921. Rehearing Denied May 26, 1921.)

1. **Evidence** ☞83(3)—State lands presumed to have been appraised and notice given.

In state's action to cancel sale of public land sold as dry agricultural land for $1.50 an acre, upon the ground that land was legally appraised at $2 an acre at the time of the sale, and that the Commissioner of the General Land Office had not notified the county clerk of county in which land was situated of classification of land and the appraisement thereof at $1.50 an acre, under Act of 1897, c. 129 (10 Gammel's Laws, p. 1238), it will be presumed that the Commissioner in awarding land to the purchaser had classified the land as agricultural and had appraised it at $1.50 an acre, and that the county clerk had been notified of such classification and appraisement in the manner prescribed by the statutes in force at such time, the burden of proof being upon the state to rebut such presumption by direct and affirmative evidence.

2. **Public lands** ☞173(4)—Evidence held to prove land appraised at figure at which it was sold.

In state's action to cancel sale of public land sold as dry agricultural land for $1.50 an acre upon the ground that land was legally appraised at $2 an acre at the time of the sale, and that the commissioner of the General Land Office had not notified the county clerk of county in which land was situated of classification of land and the appraisement thereof at $1.50 an acre, under Act of 1897, c. 129 (10 Gammel's Laws, p. 1238) evidence *held* to prove that the land had been duly appraised at $1.50 an acre, and that notice thereof had been sent to and received and recorded by the county clerk at the time of the sale.

3. **Public lands** ☞173(22)—Purchaser's right to reinstatement on same terms as original purchase not affected by Land Commissioner's subsequent reclassification of land.

Purchaser of public land classified at time of purchase as agricultural land, who defaulted in payment of interest, was entitled to reinstatement of sale with all rights received at time of original purchase, on payment of amount due, where no rights of third persons had intervened, under Rev. St. art. 5423, providing that land forfeiture of land for nonpayment of interest "be resold under the provisions of this act or any future law," but that purchaser be reinstated on payment of amount due if no rights of third persons have intervened, notwithstanding reclassification of purchased land, during an interval between purchase and forfeiture, as mineral land under article 5433, providing for sale of such land with reservation of minerals to the state, where article 5423, giving purchaser the right to reinstatement, was in existence at time of purchaser, and was therefore a right which the Land Commissioner's subsequent reclassification of the land could not operate to destroy.

4. **Public lands** ☞173(22)—Forfeitures not favored.

Forfeitures by statute or contract are not favored, and must be scrutinized, while statutes or contracts designed to give relief from the rigors of forfeiture are liberally construed so as to afford the maximum relief.

5. **Public lands** ☞173(22) — Purchaser after forfeiture of previous sale, who voluntarily abandoned land, had no intervening rights barring reinstatement of original purchaser.

Purchaser's right to reinstatement under Rev. St. art. 5423, providing for reinstatement where no rights of third persons have interven-

ed, following forfeiture for nonpayment of interest, was not affected by the fact that during interval between forfeiture and reinstatement third person made application to purchase the land, where such person did not complete his purchase by actually settling on the land, but voluntarily abandoned it.

**6. Public lands ☞173(22)—Right to reinstatement not affected by fact that cancellation of abandoned sale to third person had not been formally entered on Land Office books.**

Where third person, who had made an application to purchase land after forfeiture of previous sale for nonpayment of interest under Rev. St. art. 5423, did not complete purchase, but voluntarily abandoned it without acquiring any substantial right, purchaser or his vendee, by payment of amount due, under such statute, were entitled to reinstatement,. even though cancellation of sale to third person had not been formally entered on the Land Office books.

**7. Deeds ☞121—Quitclaim deed conveys no more than present interest of granter.**

A quit claim deed conveys no more than the present interest of the grantor in the land described, and does not extend to an interest subsequently accruing.

**8. Public lands ☞173(22)—Quitclaim deed, executed after forfeiture, entitled grantee to reinstatement under statute.**

A quitclaim deed, executed by purchaser's successor in interest after forfeiture of sale for nonpayment of interest under Rev. St. art. 5423, entitled grantee to reinstatement on payment of amount due, if rights of third parties have not intervened, under such statute; the grantor having enjoyed such a right and having conveyed by quitclaim deed the interest held by him at time of the execution of the deed.

**9. Public lands ☞173(22)—Right to reinstatement not affected by false representations to Land Commissioner.**

The right to reinstatement of successor in interest of purchaser of public land under Rev. St. art. 5423, after forfeiture for nonpayment of interest, was a vested right, where no rights of third parties had intervened, which could not be affected by any false representations to Land Commissioner by successor in interest.

Cobbs, J., dissenting on motion for rehearing.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by the State of Texas and another against the Gulf Production Company and others. Judgment for plaintiffs, and defendants appeal. Reversed and rendered.

D. Edward Greer, of Houston, Brooks, Hart & Woodward, of Austin, John G. Gregg, of Fort Worth, Kay, Akin &' Kenley, of Wichita Falls, White, Cartledge & Wilcox, of Austin, W. P. McLean, of Fort Worth, and Black & Smedley, of Austin, for appellants.

Williams & Williams, T. J. Conway, John Maxwell, and J. N. Gallagher, all of Waco, and E. R. Pedigo, C. M. Cureton, and E. F. Smith, all of Austin, for appellees.

SMITH, J. The land in dispute is valued in the pleadings at $8,000,000. Up to the 1st day of June, 1920, the last day to which an accounting is shown in the record, petroleum oil of the cash value, including interest to said date, of $737,479.04, had been produced from the land. The expense incurred in producing the oil was $420,068.36, which was deducted in the judgment from the gross proceeds. The state of Texas obtained judgment for $92,184.88, and P. K. Shuler for $225,225.-80, being the net balance after deducting the cost of production, and for improvements, placed on the land by the company producing the oil, of the value of $114,599.88. The land was originally offered by the state at $1 an acre, without a taker. Subsequently, the price was raised to $2, then sold, in 1899, at $1.50 an acre. The transcript of the record in the case comprises 311 pages, and the statement of facts, 203 pages, while counsel have kindly favored us with 446 pages of briefs. There lies before us, then, the grand total, and prodigious task, of 960 pages. But the properties in controversy are of commanding value, the questions raised in the record are serious and far-reaching, and in their briefs counsel have very ably and very frankly presented these questions to the obvious end that a just result may be ultimately reached in the litigation.

The litigation grows out of a dispute over the title to 160 acres of public land in Stephens county, described as the northeast quarter of section 22, in block 6, Texas & Pacific Railway Company surveys, and was classified as "dry agricultural," up to some time in 1916, when it was reclassified as "mineral." On October 30, 1899, J. M. Kidd made application through the General Land Office to purchase the land as dry agricultural, at $1.50 an acre, and the application, as well as the first payment on the basis of $1.50 an acre, was accepted by the Land Commissioner, and in pursuance thereof the land was sold and awarded to Kidd on January 22, 1900. Each year thereafter, on the 1st day of November, the time fixed by law, Kidd and his successors in title regularly paid to the state the annual interest on the purchase price, on the basis of $1.50 an acre, until November 1, 1915. There was default, however, in the interest payment due on that date, and the following month the sale was forfeited by the Commissioner because of such default. On June 14, 1916, while the sale to Kidd was in suspense, the land was awarded to one V. Griffin, but upon his failure to settle thereon within 90 days, as required by law, this sale was, on February 9, 1917, canceled, and in that way Griffin dropped out of the title. On the same day, upon payment to the state of

the past-due interest, the Kidd sale was reinstated, as provided by the statute. In pursuance of an opinion of the Attorney General, that the reinstatement of the Kidd sale was invalid, and because of the receipt of that opinion, the Land Commissioner, on September 2, 1919, canceled the sale to Kidd, and on the same day issued to P. K. Shuler a permit to prospect for oil and gas on the land in dispute, and this suit was instituted by the state of Texas to enforce the cancellation of the Kidd sale and establish the validity of the Shuler permit, and for this purpose was joined by Shuler as a party plaintiff. Those holding under the Kidd title, by transfer or by lease, were made defendants.

The cause was tried by a jury upon special issues, and upon the answers of the jury to these special issues judgment was rendered in favor of plaintiffs and against defendants in the court below for the title to and possession of the land, and in favor of the state of Texas for $92,184.88, being the value of one-eighth of the oil taken from the land up to June 20, 1920, and in favor of Shuler for $225,225.80, the net balance of the value of said oil after deducting $420,068.36 covering the expense of production thereof, and for the title to and possession of improvements placed on the land by the Gulf Production Company and used by it in the development of the land for oil purposes, of the value of $114,599.78. All defendants have appealed.

The basis of the litigation is the sale of the land to J. M. Kidd in 1899. The state of Texas and its coplaintiff, Shuler, attack the validity of that sale as being void upon the ground that at the time it was made the land was legally appraised at $2 an acre, whereas Kidd applied to purchase it, and it was sold to him, at the price of $1.50 an acre. It was upon this ground that appellees recovered, although they sought recovery upon other grounds as well, to be adverted to hereafter. In response to the only two special issues submitted to them the jury found (a) that the Commissioner of the General Land Office did not, after August 20, 1897 (on which date the minimum value of the land was reduced by statute from $2 to $1.50 an acre) reduce the valuation of the land from $2 to $1.50 an acre, and (b) that the Commissioner did not notify in writing the county clerk of Stephens county of such reduction prior to the sale to Kidd, and that the said clerk did not receive such notice prior to that time. Before undertaking to set out the facts disclosed by the record, it is well to consider the statutes bearing upon the questions raised:

Under the Acts of 1879 (section 1, c. 28, 9 Gammel's, 55) the public free school lands of the state were put on the market, it being provided (Id. § 2) that such lands should be classified and their value appraised by the respective county surveyors, subject to approval and correction by the county commissioners' courts, but that in no case should such value be fixed at less than $1 an acre. This act seems to have been superseded by the Acts of 1883, which provided (section 2, c. 88, 9 Gammel's, 391) for the creation of the State Land Board, consisting of the Governor, Attorney General, Comptroller, Treasurer, and Commissioner of the General Land Office, which should (Id. § 3) cause the public lands to be classified as agricultural, pasture, or timber, and further providing (Id. § 4) that such lands should not be sold for less than $2 for lands not watered or timbered, $3 for watered lands, and $5 for timbered lands. In 1895 (section 3, c. 47, 10 Gammel's, 793) it was provided that the Commissioner of the General Land Office should cause the public lands to be classified or appraised, or classify and appraise them himself, into (Id. § 4) agricultural, pasture, or timber lands; that (Id. § 6)—

"It shall be the duty of the Commissioner of the General Land Office to notify in writing the county clerk of each county of the valuation fixed upon each section of land in his county, and in each county attached to it for judicial purposes, which he offers for sale, which notification shall be kept by the clerk in his office and recorded in a well-bound book, which shall be open to public inspection."

This article has not been amended, and is still in force. It was further provided by this act (Id. § 7) that the lands should not be sold at less than $2 an acre, except pasture lands, which should not be sold for less than $1 an acre, and timber lands, which should not be sold for less than $5 an acre. By the act of 1897 (chapter 129, 10 Gammel's, 1238) the authority of the Land Commissioner to classify and appraise the lands was continued, but the minimum price at which agricultural lands should be sold was fixed at $1.50 an acre, and grazing lands at $1 an acre. These minimum prices were in effect at the time of the application of and sale to Kidd.

So it will be seen that, according to a strict construction of the statutes then in force, the land was not subject to the sale to Kidd unless it had theretofore been appraised at $1.50 an acre, and notice of such appraisement sent to and received by the county clerk of Stephens county.

We have made the most painstaking examination of the record, and have reached the conclusion that the evidence conclusively shows that the land in controversy was in fact appraised by the Commissioner of the General Land Office at the price of $1.50 an acre, and that notice thereof had been given to and received by the county clerk at the time Kidd applied to purchase the land. Practically all the material evidence in the case consisted of records solemnly made, some of them long years ago, while the transactions were actually transpiring, and others at intervals thereafter. And there was no conflict in the parol evidence, which was explanatory of, and fortified the effect of, the

documentary evidence, thus in effect eliminating all issues of fact, so that the only questions arising in the case are questions of law to be applied to undisputed facts.

[1] In the first place, then, the act of the Commissioner of the General Land Office in awarding the land to Kidd created the definite presumption that the Commissioner had classified the land as agricultural and appraised it at $1.50, and the county clerk of Stephens county had been notified of such classification and appraisement, each in the manner prescribed by the statutes then in force. And while appellees in attacking the validity of the sale and award had the right to rebut that presumption, the burden of proof was upon them to do so, and by direct and affirmative evidence. Corrigan y. Fitzsimmons, 97 Tex. 595, 80 S. W. 989; Smithers v. Lowrance, 100 Tex. 77, 93 S. W. 1064; Holt v. Cave, 38 Tex. Civ. App. 64, 85 S. W. 309; Hood v. Pursley, 39 Tex. Civ. App. 477, 87 S. W. 870; Stolley v. Lilwall, 38 Tex. Civ. App. 49, 84 S. W. 689. In Corrigan v. Fitzsimmons, supra, Chief Justice Gaines said that "under the present law, it is the duty of the Commissioner of the General Land Office to cause the lands to be classified and appraised, and to notify the clerk of the county court of the county in which they are situate and thus put them upon the market. It is also his duty to know that this has been done before he awards a sale," and that when he makes the award the law presumes that these things have been done, that "the fact that he awarded the lands under the application is evidence of the existence of the facts necessary to give him authority to sell." Even if that presumption in this case had stood alone, and without any support in the testimony, we think the evidence introduced to overcome the presumption was wholly insufficient for that purpose. All such evidence was of a purely negative nature. None of it was direct, or affirmative. On the other hand, the evidence introduced in support of the facts presumed was overwhelming, and in our opinion conclusively establishes the facts without the aid of the presumption. We will set out some of this evidence:

Kidd did not himself undertake to make out his application to purchase the land. At his request the county clerk of Stephens county made it out for him, although he was not charged by law with that duty. When Kidd made the request of him, the clerk withdrew to another room in his office, presumably to get from his records the necessary data upon which to base the application. Kidd so testified upon direct examination, although upon cross-examination he said he did not see just what the clerk did while in the other room. In the very nature of the circumstances, however, it may be assumed, although such is not necessary to the finding on any material issue here, that the clerk went into the other room to inform himself from his records as

to the status—the description, classification, appraisement, etc.—of this tract of land, since it would be absurd to assume that he would have all this information tabulated in his mind ready at all times for instant use. But whether his retirement to another room was for this purpose or not, the clerk on this or some prior occasion obtained this information from his records, or from some other source of information satisfactory to himself as county clerk, charged by law with the duty of keeping records of such official information since it is a fact that upon his return to where Kidd was awaiting him he wrote out the application, filling in all the blanks, including description, classification, appraisement, and such other matters as were necessary to put the paper in a form acceptable to the Commissioner of the General Land Office. He showed the classification to be "dry agricultural," and the appraisement to be "$1.50," which later checked with the records of the land office and was there "O. K.'d." He figured out for Kidd, the applicant, the amount of the first payment, on the basis of $1.50 an acre, which was later accepted as correct by the Land Commissioner. Kidd did nothing in the premises but sign and swear to the application, execute the obligation, and furnish the remittance for the first payment. The clerk then forwarded the application and payment to the General Land Office, where it was received and filed on October 30, 1899. It appears that it was not taken up for consideration in the General Land Office until after December 9, 1899, when, in the usual course, it was referred to the head sales clerk, who in turn referred it to the examining clerk. At that time it bore on its back the indorsements, among others, "classification, dry agricultural," and "appraisement, $1.50." The examining clerk took it to the records in the office and compared it with such records to ascertain if the land had been applied for by Kidd at the correct classification and appraisement. This clerk, after running the records, entered his "O. K." on the back of the application opposite each of the indorsements, "classification, dry agricultural," and "appraisement, $1.50," which meant that he had found from the records that the land was in fact classified as dry agricultural and appraised at $1.50 an acre. Upon this showing, and finding the application in due form in all other respects, the head sales clerk indorsed thereon the word, "accept," which meant that it had come to him, showing the land to be dry agricultural and appraised at $1.50, and that there was no conflict, and that the land was to be awarded as applied for. The award was actually made on January 22, 1900, and official notice thereof was given to the county clerk by the Commissioner on February 1, 1900. While the Kidd application was pending, however, and before it had been reached for consideration in the Land Office, one J. M. Cook wrote the

Commissioner that he desired to apply to purchase the land in dispute, and asked as to the existing status thereof, and was officially advised by the Commissioner, on December 9, that the land was classified as dry agricultural, and "the price is $1.50 an acre." And again: On September 22, 1899, this same man, Cook, made application to the Land Office to purchase the land in controversy as dry grazing and at $1 an acre. This application took the same course in the Land Office as the Kidd application did later on. The head sales clerk gave it to the examining clerk, who took it and ran 'the records for verification. The indorsements on the back of the paper showed "dry grazing" and "appraisement, $1," instead of "dry agricultural," and "appraisement, $1.50," as in the Kidd application. And, when the clerk checked those indorsements with the records, instead of writing "O. K." opposite them, as he did on the Kidd application, he wrote "dry agricultural" and "appraisement, $1.50," thus asserting that he had found from an examination of the records that the land was classified as dry agricultural and appraised at $1.50 an acre, at which it was subsequently sold to Kidd. And, instead of indorsing the Cook application "accept," as he did the Kidd application later on, the head sales clerk indorsed it "reject and refund," and the Cook application was thus rejected because the examination of the records by the clerk charged with that duty disclosed that the land was classified as dry agricultural and not dry grazing, and appraised at $1.50 and not $1. This rejection occurred November 27, 1899, after the Kidd application was filed, but before it had been reached for examination in the Land Office. Thus, in each of these three groups of circumstances the Commissioner of the General Land Office, through his authorized subordinates, officially ascertained and determined from the records of his office, and declared, the land in controversy to be appraised at $1.50 an acre. And this all occurred while Kidd's application was on file and before the award was actually made to him. As a matter of fact Cook subsequently, in May, 1900, purchased the quarter section adjoining the Kidd quarter section on the south, as dry agricultural, and at the price of $1.50 an acre, the same as the Kidd classification and appraisement.

These further facts were shown: Prior to 1897, while the minimum price of this and similar lands was fixed by law at $2 an acre, the Land Commissioner had prepared in his office what was designated as "daily work book No. 6," in which the classification and appraisement of the public lands were shown for the guidance of the Commissioner and his subordinates in carrying on the work of the office in the sale and lease of those lands. In this work book 6, the land in dispute was shown to be appraised at $2 an acre, the then minimum, and at which price the land had theretofore been formally appraised. In 1897 the Legislature reduced the minimum price of this and like classified lands to $1.50 an acre. The Commissioner had theretofore adopted the minimum price of lands, as fixed by the statute, as the appraised and selling value of such lands, and this was the fixed policy of the office, under definite instructions of the Commissioner to his subordinates, and the various county clerks, including the Stephens county clerk, had been so advised, and it was so generally understood by the public. This policy was in effect in 1897, when the minimum was reduced on this land to $1.50. Shortly 'after this reduction, the Commissioner had prepared daily work book No. 5, and because of the adoption of the minimum as the appraised and selling value of the lands, the clerks preparing the book 5 were directed by the Commissioner to omit the appraised value from its appropriate column in the book, "and consider the lands on the market at the minimum." This was done, and in this way there was no showing of such appraisements in this book 5. When this book was completed, about 1898, it was put in use in the place of book 6, above described, the active use of which was thereupon discarded. So, the appraised value of the land in dispute, as well as of hundreds of other tracts, was not shown in work book 5, which continued in use until 1902, when it was superseded by book 30, which showed this land to have been classified as dry agricultural and appraised at $1.50, and sold to Kidd. This work book 30 is still in use. In 1902, also, the Commissioner mailed out to the Stephens county clerk a list of lands in that county, showing this tract to be classified as dry agricultural and appraised at $1.50 and sold to Kidd. The bookkeeping account with Kidd, as kept in the Land Office, showed the annual interest payments as they accrued for 18 years, always paid and accepted on the basis of $1.50 an acre. So far as we are able to find, every reference to the appraised value of this land in the records of the Land Office and in the Stephens county clerk's office, made since 1895, when the land was formally appraised at $2 and notice given to and recorded by the clerk, shows such appraisement to be $1.50 an acre. And, finally, in March, 1918, more than 18 years after the sale to Kidd occurred, we find the Commissioner of the General Land Office definitely reiterating that at the time Kidd purchased it the land was classified as dry agricultural and appraised at $1.50 an acre, as will be seen from the following significant correspondence:

"Joseph L. Mayfield, Oil Producer.

"Wichita Falls, Texas, March 19, 1918.

"Hon. J. T. Robison, Land Commissioner, Austin, Texas—Dear Sir: I am desirous of learning the classification on the N. E. ¼ Sec.

22, Blk. 6, T. & P. Ry. Co., Certificate 2/845, in Stephens county, Texas.

"I think this land was originally purchased by a Mr. Kid, transferred a number of times and finally forfeited for the nonpayment of interest, sold, reforfeited and finally reinstated to a Mr. Jno. F. Lewis under the original purchase.

"Am desirous of knowing the original classification, also if there was any reclassification under the reinstatement.

"Please send bill.

"Yours very truly,  ·  Joseph L. Mayfield.

"Received Mar 20, 1918.

"Referred to Old Title."

"March 21, 1918.

"Mr. Joseph L. Mayfield, Wichita Falls, Texas—Dear Sir: Replying to yours of the 19th instant, beg to advise that the N. E. ¼ of section 22, block 6, Cert. 2/845, T. & P. Ry. Co., 160 acres in Stephens county, was classified as dry agricultural land and appraised at $1.50 per acre under the act of 1895; amended by act of May 19, 1897, and awarded J. M. Kidd as an actual settler January 22, 1900, on his application filed October 30, 1899, on said classification and appraisement. J. M. Kidd made proof of three years' occupancy and the required improvements of said land, November 7, 1905, and filed the same in this office November 9, 1905. Said land was forfeited for nonpayment of interest December 30, 1915, and subsequently awarded V. Griffin as his home tract June 14, 1916, on his application filed May 2, 1916, as mineral and agricultural land at $6.00 per acre. The sale to Griffin, however, was canceled February 9, 1917, on account of his failure to file his affidavit of settlement on said land within the required time and the J. M. Kidd purchase was reinstated on the records of this office February 9, 1917. It is now in good standing in his name and the annual interest is paid on said account to November 1, 1917.

"There is no transfer to Jno. F. Lewis of this land on file and classification and appraisement of said land under the J. M. Kidd stands as the correct classification and appraisement thereof. It was subsequently reclassified as mineral and agricultural after the forfeiture of the Kidd purchase, but the sale to Kidd having been reinstated, the former classification and appraisement governs. Fee 50 cents for this information.

"Yours very truly,

"J. T. Robison, Commissioner."

The present Commissioner of the General Land Office, who was a clerk in that office at the time the sale to Kidd was made, and whose long and honorable service in this office as such clerk and as Commissioner excites great respect and admiration, testified that while he signed the Mayfield letter, it was in fact dictated by C. M. Calloway, the "old title" clerk in the office, and that he did not "think that letter shows the true record facts of my office," but he did not undertake to point out the particulars in which there were errors in the letter. The record shows, too, that Mr. Calloway, who dictated the Mayfield letter, has been a clerk in the Land Office for over 50 years, and we are induced

by this fact to look with much respect upon his solemn declarations concerning the contents and effects of the records of that office.

Now, to overcome the presumption of law, and the force of the facts hereinabove set out, appellees introduced and call our attention to this additional evidence: On June 11, 1895, the Land Commissioner classified the whole of section 22 (of which the land in dispute is the northeast quarter) as dry agricultural, and appraised it at $2 an acre, and this classification and appraisement was sent to, received and recorded by, the Stephens county clerk. This classification and appraisement was shown in work book No. 6, heretofore referred to, and which was in use from 1895 to the latter part of 1897 or early part of 1898, shortly after the minimum price of this land was reduced by the Legislature from $2 to $1.50. The northwest quarter of section 22 was sold at $2 an acre, in February, 1897, before the minimum price was reduced to $1.50. The southwest quarter was sold in 1900 as dry grazing land, at $1 an acre, the minimum price for that class of land. The southeast quarter was sold to Cook, in May, 1900, as dry agricultural, at $1.50, the then minimum price. The Land Commissioner and the county clerk of Stephens county testified that they had before the trial searched their respective offices, and were unable to find any record of where the land had been formally appraised at $1.50 an acre, or at any other price than $2. The present Commissioner also testified that in investigating matters arising with reference to this land after its sale to Kidd, and involving the classification and appraisement, clerks would first refer to the record of the sale; if upon such reference there was anything on the face of the record indicating any inaccuracy or importing irregularity in the classification or appraisement, the searchers would go on back to the sources of original information, but in the absence of such indications he would assume the record of the sale showed the true facts and go no further. Appellees contend that this method of investigation neutralizes the probative effect of the fact that all the records and other documentary evidence created since 1895 show the appraisement of the land at $1.50. But we are unable to agree with that view, or to give such vital effect to such conjecture. And in no event would the rule apply to the reasons shown for the rejection of the application of Cook on November 27, 1899, nor to the declaration of the Commissioner in his letter to Cook of December 9, 1899, that the land was classified as dry agricultural and appraised at $1.50 an acre, because it affirmatively appears from the letter to Cook that at that time the Kidd application had not been reached for examination in the Land Office, nor the sale to Kidd consummated.

In the letter to Cook, obviously referring to Kidd's application, the Commissioner, in an official communication signed by his chief clerk, advises Cook:

"There is an application on file in the office for the N. E. ¼ of this section (22), but I do not know whether it will be accepted or not, as it has not yet been reached."

It was not reached, or at least was not acted on, until January 22, 1900, six weeks later. So, in correcting the indorsement on the Cook application on November 27, 1899, so as to show the appraisement to be $1.50, instead of $1 as applied for, and in writing Cook on December 9, 1899, that this land was appraised at $1.50, the searchers were compelled to go to the sources of original information in order to ascertain, in each instance, what the true appraisement was. They could not have had recourse to the sale to Kidd, which not only had not been made, but the application for which had not yet been reached even.

[2] Now, we have gone into the facts in the case at great length, of course, and no doubt with tedious particularity, but the whole appeal pivots about the question of fact discussed, which is entitled to the greatest consideration. And upon such consideration we hold that these facts conclusively show that the land, at the time of the sale, had been duly appraised at $1.50 an acre. It is true, of course, that some of the facts we have set out do not apply to or bear upon the question of whether or not notice of this appraisement was sent to and received by the county clerk of Stephens county. As has been shown, the act of awarding the land to Kidd created a presumption that such notice was given, received, and recorded by the clerk. In addition to that is the fact that when the clerk undertook to make out Kidd's application he obviously consulted his records to ascertain the appraisement. As for that, it does not matter whether he consulted these records at the moment, or the day before, or at any other particular time, since the reference, whensoever made, disclosed the true appraisement. Obviously he did not consult or rely on the 1895 appraisement, because that showed $2; whereas, he wrote in the application the true appraisement of $1.50. We think the circumstances make conclusive the presumption of law, and neither those facts nor the presumption are shaken by the mere testimony of the present county clerk that, after 20 years, he has not been able, after search at this time, to locate in his office any formal appraisement at $1.50 an acre.

We hold, then, that the sale to Kidd of the land in controversy was regularly made, and is valid, and not subject to the attack made upon it by appellees.

[3] Appellees present a number of cross-assignments of error, and it is appropriate that they be now considered. It appears that prior to the reinstatement of the Kidd sale the land in dispute, theretofore classified as dry agricultural, was reclassified as mineral, and under the act of 1907 (now article 5433, R. S.) it was provided by statute that land theretofore or thereafter so classified might be sold for agricultural or grazing purposes, but that such sales should be upon the express condition that the minerals in such lands should be reserved to the state, and that such reservation should be stated in all applications to purchase. Appellees make the contention that because of such reclassification and of that statutory provision, the reinstatement of the Kidd sale was forever barred, in view of the provision in the Acts of 1895 and 1897 (now article 5423, R. S.) that forfeited lands should revert to the state and be resold under the provisions of those acts or of any future law. This contention of appellees was covered by allegations in their trial petition, which were stricken out upon the exception that the act of 1907, even if applicable, and the reclassification by the Land Commissioner subsequent to Kidd's purchase of the land, could not operate to destroy the right, given Kidd by statutes in force at the time he purchased, to reinstate the sale.

The logical effect of appellees' contention is that when he permitted a forfeiture of his sale Kidd had no more rights in the land in dispute than did any other person anywhere; that the act of the Land Commissioner in reclassifying the land forever cut off Kidd from the previous right which existed at the time he purchased, to reinstate his purchase by making the payment provided by the statute in force at the time he purchased; that the only right he really had was the right, enjoyed by every one, to apply for and purchase the land under the new classification, and in accordance with the provisions of the act of 1907 (article 5433).

It is true, as appellees urge in support of their cross-assignments, that when Kidd permitted the forfeiture the land reverted "to the particular fund to which it originally belonged," and was thereupon subject to be "resold under the provisions" of the law then existing or subsequently enacted, as provided by the forfeiture statute (article 5423). It would have been absurd, of course, for the Legislature to provide for the forfeiture without also providing for the resale of the land so returned to the state. Otherwise purchasers could cause the state's lands to lie idle until doomsday by the simple device of defaulting in payments, thereby inducing the forfeitures provided for. But having provided for the forfeiture and resale of the lands, the Legislature sought to relieve the harshness of the forfeiture by providing for the reinstatement of the forfeited sales, under certain named conditions.

[4] The primary object of the state in placing its public domain upon the market was the securing of actual settlers on these lands. The revenues to be derived from sales was but a secondary consideration, a mere incident to the greater purpose of supplying homes to those who sought and lived in them in good faith. The wisdom of this policy of our forefathers has never been seriously questioned, and the provision for the reinstatement of sales forfeited was an expression of the spirit of that policy. It was right and just that those who had settled upon and improved the state's lands in response to the invitation of the state, and who had endured the hardships incident to such settlement, and the privations incident to such improvement, should be given an opportunity to retrieve their lands when forfeited by reason of temporary misfortunes and the consequent inability to meet their payments in strict compliance with their obligations. Forfeitures by statute or contract are not favored. They must be viewed with a cold and literal scrutiny, that the injury wrought may be held to the minimum. On the other hand, statutes or contracts designed to relieve from the rigors of forfeiture are looked upon warmly and construed liberally, so as to afford the maximum relief. And this reciprocal rule applies as well to the great state of Texas as to its humblest citizen. So, the provisions of the statute for the forfeiture of sales, and for the reinstatement of such sales, should be tested by the rule in question. The provision for reinstatement will be quoted:

" * * * In any cases where lands have been forfeited to the state for the nonpayment of interest, the purchasers, or their vendees, may have their claims reinstated on their written request, by paying into the treasury the full amount of interest due on such claim up to the date of reinstatement, provided that no rights of third persons may have intervened. In all such cases, the original obligations and penalties shall thereby become as binding as if no forfeiture had ever occurred. * * *"

It will be observed that there are two conditions upon which reinstatement may be had: First, the payment of the full amount of interest due by the purchaser up to the date of reinstatement; and, second, the absence of intervening rights of third persons. Appellees seek to inject here a third condition, to wit, that the classification of the land has not been changed since the original purchase was made. And under this third condition appellees seek to defeat the reinstatement of the Kidd sale by simply showing that when Kidd applied for and purchased the land it was classified as dry agricultural, and priced at $1.50 an acre, whereas, at the time of the reinstatement it was classified as mineral, and appraised at another value; that this reclassification and reappraisement after the award to Kidd and be-

fore the reinstatement of his purchase was an absolute bar to the reinstatement. But we cannot subscribe to this theory. To do so would require us to write into the reinstatement provision a condition not therein created, and wholly foreign to such provision—a condition that would entirely defeat the very purpose of the act. If the Legislature had intended to provide that the reinstatement must be subject to or defeated by an arbitrary change by the Land Commissioner of the classification and appraisement of the land, it should and would have affirmatively and definitely said so in terms. The provisions for reinstatement were in effect when Kidd purchased the land, and were embraced in the contract between the state and Kidd when the latter purchased, and neither Kidd nor the state could thereafter arbitrarily and without the consent of the other write into the contract any provision or condition varying, restricting, or enlarging the terms thereof. If the state could by act of its Legislature ingraft this onerous condition onto the contract, then by the same license it could by like means increase the original purchase price of the land, or the rate of interest or terms of payment thereon. The payment of the back interest was the only condition, so far as the state was concerned, required of Kidd in procuring the reinstatement of his purchase, and the subsequent act of the Commissioner in reclassifying and reappraising the land could not serve to create an additional condition. Anderson v. Neighbors, 94 Tex. 240, 59 S. W. 543; Hooks v. Kirby, 58 Tex. Civ. App. 335, 124 S. W. 156 (writ of error denied); Wing v. Dunn, 60 Tex. Civ. App. 16, 127 S. W. 1101 (writ of error denied [Sup.] 128 S. W. 108); Jumbo Co. v. Bacon, 79 Tex. 5, 14 S. W. 840; Bates v. Bratton, 96 Tex. 279, 72 S. W. 157; Houston Oil Co. v. McGrew, 107 Tex. 220, 176 S. W. 45. In Hooks v. Kirby, supra, this principle is well stated in the following:

"The law under which the timber was purchased from the state gave the absolute right to the purchaser to buy the land at any time within five years from the date of the sale of the timber to him, or at least until all the timber is removed. This right formed a part of the consideration paid for the timber, and entered into the contract as much as did the cash consideration of the $5 per acre which he paid. When he paid the cash and took a deed to the timber, the law wrote into the contract that he was also thereby granted the right to buy the land within a certain time for a certain further consideration, and this right became vested and cannot be impaired by subsequent legislation."

Appellees contend that the act of 1895 (article 5423), providing that forfeited lands should revert and "be resold under the provisions of this act or any future law," subjected the resale of such lands to the provision of the act of 1907 (article 5433), that "the land which is now or may hereafter be reclassed as mineral may be sold for agri-

cultural or grazing purposes, but all sales of such land shall be upon the express condition that the minerals shall be and are reserved to the fund to which the land belongs," and that as the land in dispute had been reclassified as mineral at the time Kidd's vendee undertook to have his purchase reinstated, the status of the land was so altered as to prevent the reinstatement; that the act of 1907 was a "future law" as contemplated by the act of 1895. The most obvious fallacy in this contention is that both the provisions relied on relate exclusively to the resale of the lands. They do not purport, directly or indirectly, to relate to the reinstatement of forfeited sales. This is so obvious from the plain language of these provisions that appellees' contention approaches the frivolous. The provision in article 5423 is a part of the forfeiture clause, relates solely to resale, and is wholly disconnected from and does not in any respect whatever refer, or purport to refer, to the provision for reinstatement. The forfeiture clause in article 5423 provides for three steps, (a) forfeiture, (b) reversion to the school fund, and (c) resale. The clause for reinstatement, which is separate and apart from the forfeiture clause, prescribes two conditions upon which the reinstatement may be had, (a) payment of all back interest, and (b) absence of intervening rights of third parties. There is no condition there that the reinstatement cannot occur in the face of a reclassification or reappraisement of the land. Moreover, the clause affirmatively provides that "in all such cases" of reinstatement "the original obligations and penalties shall thereby become as binding as if no forfeiture had ever occurred." This provision relates alike, of course, to the state and to the purchaser. And article 5433, upon which appellees rely as prohibiting the reinstatement of the Kidd sale, has no reference to reinstatement, either directly or by implication. That article simply provides that lands thereafter classed as "mineral may be sold, * * * but all sales of such land shall be upon the express condition that the minerals shall be and are reserved to the fund to which the land belongs, and such reservation shall be stated in all applications to purchase." It will be seen from its language that by no stretch of construction can this provision be made to refer to the reinstatement of forfeited sales. Appellees cite the case of Lawless v. Wright, 39 Tex. Civ. App. 26, 86 S. W. 1039, decided by this court, in support of their contention here. We adhere to every phase of the opinion in that case, but that decision defeats, rather than supports, appellees' contention here. It was there held, simply, that in case of forfeiture, title to the land reverted to the state, and that during the period in which the sale was in suspense, between the date of forfeiture and date of reinstatement, the purchaser's possession was interrupted for limitation purposes; that is to say, that the forfeiture broke the continuity of the purchaser's adverse possession against third persons for limitation purposes. In that case, as here, the land had been reclassified and reappraised, but the sale was reinstated, and the validity of the reinstatement was incidentally recognized by this court, which stated that:

"In this case, after the forfeiture, the state exercised its right to again sell the land, and had it not been for the voluntary relinquishment of his title by D. Lawless [an intervening purchaser], the purchase made by Fancher [the original purchaser] could never have been reinstated. The forfeiture destroyed his claim to the land completely, and the privilege given to him to have it restored on certain payments and on the rights of others not intervening."

[5] Appellees contend, also, that the right of Kidd to reinstate his purchase was lost to him by reason of the fact that after the forfeiture, and before the reinstatement, one V. Griffin purchased the land in question; that although Griffin did not complete his purchase by actually settling on the land, and voluntarily abandoned the land, the sale to Kidd, nevertheless, could not lawfully be reinstated, since Griffin's purchase was such an intervening right of a third person as would bar the reinstatement. The facts showed that after the Kidd forfeiture Griffin applied to purchase the land as mineral land, at $6 an acre; that the application was accepted and the land awarded to Griffin. At that time the applicant was required by the statute (articles 5408, 5410) to actually settle on the land within 90 days from the date of the application, and within 30 days after the expiration of the 90-day period file in the Land Office an affidavit showing such settlement, and that forfeiture should follow the failure either to settle or to file the affidavit. Griffin, however, instead of settling on the land, abandoned it, made no settlement thereon, filed no affidavit of settlement, and subsequently wrote the Commissioner, advising that he had found the land to be "worthless," and that the sale to him could be marked forfeited, which was done, whereupon, upon request, and the payment of back due interest, the Kidd sale was reinstated. Appellees contend that the Griffin transaction was such intervening right of a third person as absolutely destroyed the right of Kidd to reinstate. The provision in the statute for reinstatement is that such reinstatement may be made, "provided that no rights of third parties may have intervened," and appellees contend that this phrase contemplates any right that accrued at any time while the original sale was in suspense, even though such right was but momentary and had ceased to exist, and was unenforceable at the time reinstatement was sought; that it did not contemplate only such rights of third parties as were existing and enforceable at

the time the reinstatement of the original sale was sought. But we think this construction of the statute is strained and unreasonable, and was not in contemplation of the Legislature which enacted it. We think, rather, that the Legislature had in mind such rights of third parties as constituted a present existing bar to reinstatement—an existing, vested right, enforceable at the time by the party owning such right. This provision was not inserted for the benefit of the state of Texas, but for the benefit of third parties in whose favor such intervening rights existed; and, when there are no third parties who can lawfully complain of the reinstatement, the state cannot be heard to do so. In this instance Griffin is not complaining; he could not do so, if so disposed, since whatever rights he had at one time had long since ceased to exist, in law. In fact, he never had any substantial rights, because, by the very terms of the act under which he sought to purchase he could not transfer the rights he acquired, and had he attempted to do so he would have thereby automatically forfeited all of his rights to purchase. Article 5416, R. S.; Good v. Terrell, 100 Tex. 275, 98 S. W. 641. But we do not think the meagerness of his rights material. If he had the strongest of rights, they were entirely lost and destroyed at the time the Kidd sale was reinstated, and were no longer a bar to such reinstatement. Appellees cite no authority in support of their contention, while on the other hand the conclusion we have reached is supported by abundant authorities, among them being Mound Oil Co. v. Terrell, 99 Tex. 625, 92 S. W. 451; Wyerts v. Terrell, 100 Tex. 409, 100 S. W. 133; Lawless v. Wright, 39 Tex. Civ. App. 26, 86 S. W. 1039; Anderson v. Neighbors, supra; Lee v. Green, 24 Tex. Civ. App. 109, 58 S. W. 196, 847; Davis v. Yates, 63 Tex. Civ. App. 6, 133 S. W. 281; Good v. Terrell, 100 Tex. 275, 98 S. W. 641.

[6, 7] Appellees alleged, in support of a further contention, that on February 3, 1917, six days prior to the reinstatement of the Kidd sale, appellant J. F. Lewis secured from W. J. Bellamy (a remote vendee of Kidd) a quitclaim deed to the land in dispute, but that this instrument conveyed no rights whatever, because at that time Bellamy had no interest in the land; that at that time the land belonged to Griffin and stood in Griffin's name on the Land Office records, and the sale to Griffin was not canceled until February 9, six days after the conveyance of the Kidd title by quitclaim; that Bellamy having no right, title, or interest in the land at the time of the quitclaim, any after-acquired title would not inure to the benefit of Lewis. Exceptions were sustained to these allegations, and appellees complain thereat. It has been shown that Griffin had at this time completely lost all his right to purchase the land. In fact, he had never completely acquired any

substantial right, or any right that he could even transfer. He had simply made an attempt to purchase the land, but failed to follow up such attempt, and voluntarily and very deliberately abandoned it. This removed him as a possible impediment to the reinstatement of the Kidd sale, which, so far as Griffin was concerned, could have been enforced by mandamus at the time of the transfer from Bellamy to Lewis. The fact that the cancellation of the Griffin sale had not been formally entered on the Land Office books could not affect the right of Kidd's vendee to a reinstatement. So appellees' contention that the Griffin transaction was in any way an obstacle to the projection of the Kidd title is, in our opinion, quite clearly untenable and without any force at all. But the proposition that at the time of the Bellamy to Lewis quitclaim the former had no interest to convey, and by reason thereof the latter secured no right, title, or interest in the land, is a more serious one. If at that time Bellamy had no interest in or claim upon the land, then his quitclaim to Lewis was a nullity. All that a quitclaim deed could convey to Lewis was such interest as Bellamy at that time had in the title to the land, and if Bellamy had no interest in the title, then of course none passed to Lewis. The question is most interesting. Appellants cite no authorities except Bedford v. Rayner, 13 Tex. Civ. App. 618, 35 S. W. 931, which merely determines that the deed involved in that case was not a quitclaim in effect. That question is not involved here, since we are here to determine the sufficiency of allegations as to the effect of a quitclaim deed, the language of which is not set out, under the particular facts alleged. Appellees cite only one Texas case, Rodgers v. Burchard, 34 Tex. 441, 7 Am. St. Rep. 283, which decides only that a quitclaim deed conveys no more than the present interest of the grantor in the land described, and does not extend to an interest subsequently accruing. This is elemental, as we understand it. Neither party cites the case of Bates v. Bacon, 66 Tex. 348, 1 S. W. 256. In that case a void patent was issued to one Russell, the land was sold and conveyed by the sheriff, under a judgment against Russell, to Bacon; later on the Legislature validated the patent, and Bacon claimed the title created by the act validating the patent under which he purchased. The sheriff's deed may be likened, for the purpose of this inquiry, unto a quitclaim deed. We quote from the opinion in the case cited:

"The plaintiff below admitted that the patent, through which he claimed, was the same held by this court to be void in the case of Bacon & Bates v. Russell, 57 Tex. 409. He insists, however that the grant was validated by the act of March 31, 1883, and that his title was thereby perfected. His claim to the benefits of that act is through an execution sale

against Russell, the patentee, made on June 5, 1877. At that time Russell had no interest in the land. The title was in the state, and there remained until by the cited act the patent was vitalized as a grant. A sheriff's deed conveys only the right, title, and interest of the defendant in execution; if it was the act of the defendant, it contains no recital, stipulation, or covenant that could estop him from disputing the title of the purchaser upon any subsequently acquired or accruing right in himself. Freeman on Ex. § 335. The plaintiff acquired, by the sheriff's deed, only the title Russell then had—and he had none—and not what he afterwards acquired by the state's bounty.

"It was in the power of the Legislature in confirming the void grants embraced in the act of March 31, 1883, to pass its benefits to the assigns of the grantees, but this was not done, although the act passed was doubtless suggested by the opinion of this court in the case of Bacon & Bates v. Russell. It was probably considered that the title would pass to the assignee by estoppel without legislation in all instances in which it was wise that it should pass. It certainly was not politic to pass to the purchaser at execution sale any claim the defendant in execution may have had upon the charity or liberality of the sovereign."

[8] The language of that opinion affords much food for thought when considered in connection with the provision in the statute that when a sale is forfeited, as here, the land reverts to the particular fund to which it originally belonged, and when further considered in connection with article 5423 and the holding by this court in Lawless v. Wright, supra, that the forfeiture reinvests the title in the state. But upon reflection we conclude that neither the statute nor the decisions mentioned operate to cut off Lewis as vendee from the right to enforce reinstatement of the Kidd sale. It is true that a quitclaim deed conveys no more interest than the grantor has at the time, and that it conveys no interest in an after-acquired title—that the quitclaim deed from Bellamy to Lewis conveyed no interest to the latter, unless the former at that time had such interest. It is true, also, as held in Lawless v. Wright, that the state of Texas at that time was invested with the title to the land, and the right to resell the land, subject, however, and always, to the right of Kidd or his vendees to reinstate the original sale at any time in the absence of intervening rights of third parties. And just there is precisely the interest that Bellamy owned at the time of the transfer to Lewis. And that was a vested right which no statute or act of the Land Commissioner could take away from him. Moreover, the statute (article 5423) expressly gives that right to "the original purchasers or their vendees." This right may be momentarily obscured by a shadow, such as the Griffin transaction; or entirely obliterated by a complete and permanent resale, but it is there, nevertheless, and is written in clear and express language into the contract between the state and the original purchaser. It is just as clear and definite and tangible as is the right, given in the same contract, to continue the title in force by paying the interest on the 1st of November each year. Now, in the Bates v. Bacon Case, supra, the patent was held to be absolutely void. This holding made the patentee as a complete stranger to the title, divesting him of every relation thereto and claim thereon. The state was under no further legal obligation whatever to him. And while in this attitude the patentee's title was conveyed by the sheriff to Bacon, as if the patentee had done so by quitclaim deed. Subsequently the Legislature validated the patent, and the Supreme Court held that the title revitalized by this act did not inure to the benefit of the assignee of the grantee in the patent, in the absence of an express provision for that purpose; that the assignee did not acquire a title afterwards acquired "by the state's bounty" or any claim upon the "charity or liberality of the sovereign." These considerations clearly distinguish that case from this. The rights conveyed by Bellamy to Lewis were not based on any claim to the state's "bounty," or dependent upon the "charity or liberality of the sovereign," but were clear and definite rights, expressly vested in Kidd and his vendees by the terms of the original contract between the sovereign and one of its citizens. So we hold that the quitclaim deed from Bellamy to Lewis conveyed the right to reinstate the Kidd purchase.

[9] Appellees alleged, also, that the procuring of the quitclaim deed by Lewis from Bellamy was a fraud upon the state of Texas, in that, in December, 1916, Lewis represented to the Land Commissioner that he had no interest in the land in dispute, and in January, 1917, represented to the Commissioner that he owned the land, when as a matter of fact he had no interest therein; that Lewis was seeking to procure title to and possession of the land, knowing it to be near oil production and valuable, and yet knowing, also, that the Commissioner was unaware of this peculiar value; that later on Lewis procured the quitclaim deed from Bellamy and had the sale reinstated for his own use and benefit and with the intention of depriving the state of the value of the land. These allegations were stricken out upon exception that no showing of fraud was made by the allegations, which were mere conclusions of the pleader. We are quite clear that the allegations were subject to the exception, which was properly sustained. The right to reinstate the Kidd sale was a vested right, and could be defeated only by a failure to pay the accrued interest on the land, or by enforceable intervening rights of third parties. No representations of Lewis, whether true or false, could affect that right. He was, or was not, entitled to the reinstatement, and nothing he could say

would enlarge or lessen the authority of the Land Commissioner.

The conclusions we have written dispose of all material matters raised. We sustain appellants' first assignment of error, complaining of the refusal of the trial court to direct a verdict for the defendants therein. This renders immaterial appellants' remaining assignments of error, which will not be discussed. We overrule all of appellees' cross-assignments. The judgment of the district court must be reversed, and as the facts were very fully developed in the court below, judgment will be here rendered in favor of appellants.

Reversed and rendered.

## On Rehearing.

PER CURIAM. Rehearing denied.

COBBS, J. (dissenting). I cannot agree with the majority of the court in respect to the disposition made of this case on appeal. It is unnecessary to extend my reasons to any great length. When the state offers her lands for sale on a credit and requires certain necessary precedent things to be done, every single requirement must be strictly met. In such cases, to acquire her title, the burden of proof is on the purchaser to establish the antecedent equities, rights, and the requirements step by step until it is finally merged in a final patent.

In this case, J. M. Kidd applied to purchase this land, alleging it was classified as agriculture land and valued at $1.50 per acre, at which price he purchased. The state denied this, and introduced some evidence to show the land had by the proper authority at the time of the alleged purchase been valued at the sum of $2 per acre, not $1.50. This issue of fact was fairly submitted to the jury, who found against the Kidd contention, that is, the land was not valued at $1.50 per acre, but at $2. Accepting their finding as we must, then Kidd acquired no right against the state. This court, in its majority opinion, found facts and reasons to set aside the finding of the jury, and substituted therefor the court's findings and conclusions in lieu thereof, which cannot be done. I understand it is well settled, it is true, that there is always a presumption of law that officers do their duty, but I do not understand any rule of law that will justify the indulgence of inferences to overcome that presumption in the face of some evidence to support the jury's finding, however slight, supporting the official action. The state will not be, in such cases, estopped or bound by illegal acts of her officers.

Another reason for this dissent is because Kidd did not complete his purchase, and all his rights became forfeited to the state by reason of the very facts stated at length in the majority opinion. The Commissioner of the General Land Office ascertained that this land which had been erroneously classified as dry agricultural land was in fact very valuable mineral land, and thereupon reclassified it as mineral land, and changed the value from $2 to $5 per acre. But this classification was not had until after Kidd's default in his purchase requiring a forfeiture to the state. Thereafter, on the 2d day of May, 1896, V. Griffin filed his application to purchase the same at $6 per acre, whereupon the land was legally awarded to him, and the cash payment properly applied, and the obligation of $936 deferred payment retained by the Commissioner. Here was the "intervening right" the statute speaks of, the third party that cut off the right of Kidd ever afterwards to come in on his original purchase. The state, under its right secured to it by Kidd's forefeiture, had ascertained the land Kidd had claimed to purchase as dry agricultural land, at $1.50 per acre, was not dry agricultural land at all, but immensely valuable mineral land, whereupon a new classification was placed thereon representing its true and real condition reclassified at a time when the state had the power to make such reclassification and revaluation of her own land which Kidd had forfeited and abandoned to her. Surely the state had this right and dominion over her own property, for there had arisen this intervening right, and the intervening right of a third party, too. As the state sold this land, and thereby whatever right, if any, Kidd may at any time have had, was by these proceedings lost to him and passed to the intervening purchaser. Griffin failing to comply with the law respecting settlement, lost his right to complete his purchase, and he was canceled out. Now, where did the title go? It did not go up in thin air. It did not go back to Kidd or his assignees. Something had to be done again to secure the original status of purchase, if Kidd was to be reinstated. I cannot believe any supposed equity had been left in Kidd after Griffin's purchase under the law to obliterate everything done between Kidd's supposed purchase and permit his assignee to secure from the state this vastly valuable mineral land, which was, through the mistake of her officers, improperly classified, illegally sold, and valued, at the mistaken value placed thereupon at the time of his alleged purchase.

On the 3d day of February, 1917, appellant J. F. Lewis secured from W. J. Bellamy and wife a quitclaim deed to the land, but no right passed by that instrument at that time, because Griffin was then the intervening purchaser, whose purchase was not canceled out until the 9th day of February, 1917.

I cannot agree with my Associates that Kidd or his assignee had any vested right of reinstatement whatever, for the statute itself contained an express prohibition against it. That right became lost and annulled the very minute of Griffin's purchase, and there is no word or suggestion that such a privilege was conferred upon him after the intervening right of a third person had come in, that survived beyond the intervening purchaser's right for reinstatement. My construction of the statute is that up to such time as the land was unsold to another, he might do so. It was not passed to protect the right of a third person, because such right was protected by the Constitution and all law. Obviously, it was intended as a period of limitation, and after that one intervening right the statute itself is silent. To give it any other construction would be to extend that right ad infinitum; it would make no difference how many other sales became forfeited and canceled out. Such statutes must be given strict construction.

There is in my mind another very serious objection to reversing and rendering this judgment. The land was, in the first place, erroneously and illegally classified as dry agricultural land. So, when sold and purchased there was both a mutual mistake as to its classification and as to its real value. This was discovered by the officers of the state whose duty it was to classify lands after the land had reverted to the state under the forfeiture of all of Kidd's rights. In this condition of the land, and upon its proper classification and value, it was sold to Griffin. When Kidd's assignee makes this discovery after the cancellation of Griffin's rights, ignoring its real and true valuation, they attempt a reinstatement of the former purchase of land they knew had been erroneously classified and valued. I do not think they should be allowed to profit by the mistake of the state's officer, and in a case like this be reinstated. It was a mutual mistake at most that should call for a reformation of the contract if they be allowed a reinstatement. The state should not be bound by that mistake, under the circumstances of his abandonment and the intervening rights, to allow a defaulted purchaser to enforce an inequitable, defaulted, and abandoned contract, which, when supposed bad, he forfeited, and when found so good as to enrich him, ask specific performance.

For the foregoing and many other reasons I cannot concur in the opinion or the disposition of this case. It is my judgment that the motions for rehearing should be granted and the opinion withdrawn, a new one written in lieu thereof, and the judgment be in all things affirmed.