## CITY OF EL PASO v. SIMMONS.

No. 38.  Argued November 17; 1964.—Decided January 18, 1965.

498

*William J. Mounce* argued the cause for appellant. With him on the brief was *Thornton Hardie*.

*Greenberry Simmons*, appellee, argued the cause and filed a brief *pro se*.

MR. JUSTICE WHITE delivered the opinion of the Court.

Under the applicable statutes existing in Texas in 1910, the year in which the contracts in this case were made, the State Land Board was authorized to sell the public lands allocated to the Permanent Free School Fund on long-term contracts calling for a down payment of one-fortieth of the principal and annual payment of interest and principal. The time for payment of principal was extended periodically and the principal was never called due. In the event of nonpayment of interest, however, the statutes authorized the termination of the contract and the forfeiture of the lands to the State without the necessity of re-entry or judicial proceedings, the land again to become a part of the public domain and to be resold for the account of the school fund.[1] The provision chiefly in issue in this case provided:

> "In any cases where lands have been forfeited to the State for the non-payment of interest, the purchasers

---

[1] The Act of 1895 provided in pertinent part:

"Sec. 11. If upon the first day of November of any year the interest due on any obligation remains unpaid, the Commissioner of the General Land Office shall endorse on such obligation 'Land Forfeited,' and shall cause an entry to that effect to be made on the account kept with the purchaser, and thereupon said land shall

or their vendees may have their claims reinstated on their written request, by paying into the treasury the full amount of interest due on such claim up to the date of reinstatement; provided, that no rights of third persons may have intervened. In all such cases the original obligations and penalties shall thereby become as binding as if no forfeiture had ever occurred." Tex. Gen. Laws 1897, ch. 129, art. 4218f.

In 1941, the foregoing provisions were amended. Among other things, the offering of forfeited land for sale on a subsequent sale date was made permissive instead of mandatory and a provision was added stating that the right to reinstate lands forfeited thereafter "must be exercised within five (5) years from the date of the forfeiture." Tex Gen. & Spec. Laws 1941, ch. 191, § 3, Vernon's Ann. Civ. Stat., art. 5326. In 1951, the right of reinstatement was limited to the last purchaser from the State and his vendees or heirs. Tex. Gen. & Spec. Laws 1951, ch. 59, § 2, Vernon's Ann. Civ. Stat., art. 5326.[2]

---

thereby be forfeited to the State without the necessity of re-entry or judicial ascertainment, and shall revert to the particular fund to which it originally belonged, and be resold under the provisions of this act or any future law: . . . *Provided, further,* that nothing in this section contained shall be construed to inhibit the State from instituting such legal proceedings as may be necessary to enforce such forfeiture, or to recover the full amount of the interest and such penalties as may be due the State at the time such forfeiture occurred, or to protect any other right to such land, which suits may be instituted by the Attorney General or under his direction, in the proper court of the county in which the land lies or of the county to which such county is attached for judicial purposes: *Provided,* this section shall be printed on the back of receipt." Tex. Gen. Laws 1895, ch. 47.

[2] Art. 5326 now reads:

"If any portion of the interest on any sale should not be paid when due, the land shall be subject to forfeiture by the Commissioner entering on the wrapper containing the papers 'Land Forfeited,' or

500

In 1910, certain predecessors in title of Simmons, the appellee, executed their installment contracts to purchase school lands from the State of Texas. The original purchasers made a down payment of one-fortieth of the principal and made annual interest payments. The purchase contracts were assigned several times and interest payments fell into arrears during the forties. On July 21, 1947, after a notice of arrears and request for payment, the land was forfeited for nonpayment of interest. A notice of forfeiture and a copy of the 1941 Act allowing reinstatement within five years were sent to the last purchaser of record, but were returned unclaimed. Appellee Simmons, a citizen of Kentucky, thereafter took quit-

words of similar import, with the date of such action and sign it officially, and thereupon the land and all payments shall be forfeited to the State, and the lands may be offered for sale on a subsequent sale date. In any case where lands have heretofore been forfeited or may hereafter be forfeited to the State for non-payment of interest, the purchasers, or their vendees, heirs or legal representatives, may have their claims re-instated on their written request by paying into the Treasury the full amount of interest due on such claim up to the date of re-instatement, provided that no rights of third persons may have intervened. The right to re-instate shall be limited to the last purchaser from the State or his vendees or their heirs or legal representatives. Such right must be exercised within five (5) years from the date of the forfeiture. . . . In all cases the original obligations and penalties shall thereby become as binding as if no forfeiture had ever occurred. If any purchaser shall die, his heirs or legal representatives shall have one (1) year in which to make payment after the first day of November next after such death, before the Commissioner shall forfeit the land belonging to such deceased purchaser; and should such forfeiture be made by the Commissioner within said time, upon proper proof of such death being made, such forfeiture shall be set aside, provided that no rights of third persons may have intervened. Nothing in this Article shall inhibit the State from instituting such legal proceedings as may be necessary to enforce such forfeiture, or to recover the full amount of the interest and such penalties as may be due the State at the time such forfeiture occurred, or to protect any other right to such land."

claim deeds to the land in question and filed his applications for reinstatement, tendering the required payments. The applications were denied because they had not been made within five years of the forfeiture as required by the 1941 statute. In 1955, pursuant to special legislation, the land was sold by the State to the City of El Paso. Simmons then filed this suit in the Federal District Court to determine title to the land in question. In its answer the City relied upon the 1941 statute as barring Simmons' claim and also pleaded adverse possession and laches as additional defenses. The District Court granted the City's motion for summary judgment on the ground of the 1941 statute.[3] The Court of Appeals reversed, 320 F. 2d 541 (C. A. 5th Cir.), ruling that the right to reinstate was a vested contractual right and that the prohibition against impairment of contracts contained in Art. I, § 10, of the Constitution of the United States prohibited the application of the 1941 statute to the contract here in question. We noted probable jurisdiction. 377 U. S. 902. We reverse.

## I.

Although neither party has raised the issue, we deal at the outset with a jurisdictional matter. The appeal in this case is here under 28 U. S. C. § 1254 (2) (1958 ed.).[4] The Court of Appeals, after holding the Texas statute

---

[3] The District Court's judgment does not explicitly refer to the 1941 statute, but the Court of Appeals interpreted that Act to be the basis of the judgment. We accept this interpretation.

[4] "Cases in the courts of appeals may be reviewed by the Supreme Court by the following methods: . . .

"(2) By appeal by a party relying on a State statute held by a court of appeals to be invalid as repugnant to the Constitution, treaties or laws of the United States, but such appeal shall preclude review by writ of certiorari at the instance of such appellant, and the review on appeal shall be restricted to the Federal questions presented . . . ."

unconstitutional, remanded the case to the District Court to determine the City's defenses of laches and adverse possession. Under a prior interpretation of § 240 (b) of the Judicial Code, the predecessor provision of § 1254 (2), a final judgment or decree of the Court of Appeals is necessary to the exercise of our jurisdiction over the case by way of appeal, *Slaker* v. *O'Connor*, 278 U. S. 188, which was followed without comment in *South Carolina Electric & Gas Co.* v. *Flemming*, 351 U. S. 901, and questioned but not put to rest in *Chicago* v. *Atchison, Topeka & Santa Fe R. Co.*, 357 U. S. 77, the judgment in that case being deemed a final one. These questions under § 1254 (2) were neither briefed nor argued in this case and it is not appropriate to resolve them here.

In 1962 Congress expanded the scope of 28 U. S. C. § 2103 to apply to appeals from the United States courts of appeals.[5] That section now provides that an appeal improvidently taken from a court of appeals as well as from a state court shall not be dismissed for that reason alone, but that the appeal papers shall be regarded and acted on as a petition for a writ of certiorari. The restriction in 28 U. S. C. § 1254 (2) (1958 ed.) providing that an appeal from the court of appeals "shall preclude review by writ of certiorari at the instance of such appellant" is no bar to our treating this case as here on a

---

[5] 28 U. S. C. § 2103 (1958 ed., Supp. V) reads:

"If an appeal to the Supreme Court is improvidently taken from the decision of the highest court of a State, or of a United States court of appeals, in a case where the proper mode of a review is by petition for certiorari, this alone shall not be ground for dismissal; but the papers whereon the appeal was taken shall be regarded and acted on as a petition for writ of certiorari and as if duly presented to the Supreme Court at the time the appeal was taken. Where in such a case there appears to be no reasonable ground for granting a petition for writ of certiorari it shall be competent for the Supreme Court to adjudge to the respondent reasonable damages for his delay, and single or double costs."

petition for certiorari. For this provision means only that if an appeal is proper and has been taken, certiorari will not thereafter be available; where the appeal is not proper, this Court will still consider a timely application for certiorari.[6] *Bradford Electric Light Co.* v. *Clapper,* 284 U. S. 221. No timely application for certiorari has been filed in the instant case. But 28 U. S. C. § 2103 (1958 ed., Supp. V) now requires that we treat the papers whereon the appeal was taken as a petition for certiorari. Accordingly we dismiss the appeal and grant the writ of certiorari.

## II.

We turn to the merits. The City seeks to bring this case within the long line of cases recognizing a distinction between contract obligation and remedy and permitting a modification of the remedy as long as there is no substantial impairment of the value of the obligation. *Sturges* v. *Crowninshield,* 4 Wheat. 122, 200; *Von Hoffman* v. *City of Quincy,* 4 Wall. 535, 553–554; *Honeyman* v. *Jacobs,* 306 U. S. 539. More specifically, it invokes three cases in this Court, two from Texas, that held it constitutionally permissible to apply state statutes allowing forfeiture of land purchase rights to land contracts between private persons and the State made when the law did not provide for forfeiture or permitted it only upon

---

[6] The predecessor of § 1254 (1), § 240 (a) of the Act of February 13, 1925 (the Judges Act), was amended on the floor of the Senate to state that review by certiorari from the courts of appeals would carry the same scope of review "as if the cause had been brought there by unrestricted writ of error or appeal." The word "unrestricted" was added immediately before § 240 (b) (now § 1254 (2)) was introduced, and the sponsor of both amendments, Senator Cummins, explained that review by appeal as provided in that section would be limited "to the Federal question, and that it ought not to extend to the entire controversy that may be in the case," as he envisaged would be the case with certiorari review. See 66 Cong. Rec. 2919 (remarks of Senator Cummins).

court order. *Wilson* v. *Standefer,* 184 U. S. 399; *Waggoner* v. *Flack,* 188 U. S. 595; *Aikins* v. *Kingsbury,* 247 U. S. 484.[7] In those cases the. Court reasoned that the state statutes existing when the contracts were made were not to be considered the exclusive remedies available in the event of the purchaser's default since there was no promise, express or implied, on the part of the State not to enlarge the remedy or grant another in case of breach.

The Court of Appeals rejected the City's contention. The Texas cases, according to the Court of Appeals, hold

---

[7] In *Wilson* v. *Standefer,* 184 U. S. 399, Texas sold land pursuant to the Act of 1879, which made it the duty of the State in case of default to proceed to enforce its rights by court action. The Texas courts allowed the State to proceed with forfeiture under the 1897 statute providing for forfeiture by endorsement on official documents rather than by court decree. Neither the Texas courts nor this Court read the 1879 statute as providing an exclusive remedy or as a promise by the State not to modify the remedy or provide another one in the event of default. *Waggoner* v. *Flack,* 188 U. S. 595, involved a contract for the sale of state school lands at a time when the existing statutes gave the State no remedy at all upon default in annual payments. This Court found no violation of the Contract Clause in the state proceeding to declare a forfeiture under the 1897 statute. Here again "[t]here was no promise or contract expressed in the statute that the State would not enlarge the remedy or grant another on account of the purchaser's violation of his contract, and we think no such contract is to be implied." 188 U. S., at 603. The principle of *Wilson* v. *Standefer* was held controlling, the Court seeing no difference in principle between the case where the State altered an existing remedy after the contract was entered into and the case where the State supplied the remedy where none existed when the contract was made. The third case came here from the California courts, *Aikins* v. *Kingsbury,* 247 U. S. 484. There the Court found no violation of the Contract Clause in the state proceeding declaring a forfeiture by nonjudicial action as permitted by a statute passed after the contract was made, the prior law requiring the State to proceed with judicial action with a right in the purchaser to redeem within 20 days after decree. *Wilson* and *Waggoner* were considered controlling authority.

that the reinstatement provision confers a vested right which is not subject to legislative alteration.[8]   From this it concluded that under state law the five-year limitation on reinstatement was not a mere modification of remedy

[8] The state cases on this issue are unclear.   In *Fristoe* v. *Blum*, 92 Tex. 76, 45 S. W. 998, the Texas Supreme Court held that the 1887 Act providing for forfeiture upon default in making payment of "any obligation" applied to contracts made before as well as after the enactment of the Act.   Such a construction was not deemed to impair the obligation of contract, for the State had by common law the right as vendor, upon the purchaser's failure to perform his part of the contract, a right to rescind the contract of sale and resume control of the land.   The statute giving the Commissioner authority to declare a forfeiture merely supplied a more effective way of enforcing the State's common-law right of rescission.

In regard to the right of reinstatement, *Anderson* v. *Neighbors*, 94 Tex. 236, 59 S. W. 543, and *Davis* v. *Yates*, 63 Tex. Civ. App. 6, 133 S. W. 281, held that intervening third-party rights must be so far perfected as to be vested in order to defeat reinstatement rights.   *Cruzan* v. *Walker*, 119 Tex. 189, 26 S. W. 2d 908, and *Freels* v. *Walker*, 120 Tex. 291, 26 S. W. 2d 627, are of similar import.   *Hooks* v. *Kirby*, 58 Tex. Civ. App. 335, 124 S. W. 156, dealt with the right of the purchaser of timber to purchase the land itself; it did not deal with reinstatement under the section here involved.   *Gulf Production Co.* v. *State*, 231 S. W. 124 (Tex. Civ. App.), the principal support for the Court of Appeals decision, held that the legislature had not intended to defeat the right to reinstatement by reclassifying the land as mineral land, the sale of which then involved retention of mineral rights by the State.   The Court in *Gulf* did indicate that it considered the right to reinstatement a vested right with which the State could not arbitrarily interfere.   But it was not faced with a statute which actually attempted to modify this right, much less one which put a reasonable time limit upon that right.   In *Faulkner* v. *Lear*, 258 S. W. 2d 147 (Tex. Civ. App.), a case involving a forfeiture under the 1941 statute, the Texas court said that the land contract, which was made prior to 1941, "could have been reinstated only in compliance with the statute . . . as amended in 1941."   *Id.*, at 149. No constitutional or state law difficulties were noted.

In addition to the State's common-law right of rescission, *Fristoe* v. *Blum, supra,* the forfeiture statute states that nothing in the forfeiture provision "shall be construed to inhibit the State from insti-

but a change in the obligation of a contract. Relying on the theory that it is state law that determines the obligations of the parties, the Court of Appeals found that the 1941 statute abrogated an obligation of the contract and thus violated the Contract Clause of the Constitution.

We do not pause to consider further whether the Court of Appeals correctly ascertained the Texas law at the time these contracts were made, or to chart again the dividing line under federal law between "remedy" and "obligation," or to determine the extent to which this line is controlled by state court decisions, decisions often rendered in contexts not involving Contract Clause considerations.[9] For it is not every modification of a con-

---

tuting such legal proceedings as may be necessary to enforce such forfeiture, or to recover the full amount of the interest and such penalties as may be due the State at the time such forfeiture occurred, or to protect any other right to such land." Tex. Gen. Laws 1895, ch. 47, § 11. This statutory language seems sufficiently broad to preserve, with notice to purchasers, the common-law right of rescission, which, unlike statutory forfeiture, was not subject to reinstatement.

[9] The provisions dealing with forfeiture, which is one of the State's remedies in case of breach, and reinstatement, which is the purchaser's remedy to cure his breach, both operate on the rights of a party after breach and thus concern the enforcement of the contract. In this sense they are remedial and the statute of repose challenged here is an alteration of remedy rather than obligation.

But decisions dating from *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, have not placed critical reliance on the distinction between obligation and remedy. At issue in *Blaisdell* was a statute enlarging the mortgagor's right by extending the time of redemption, a measure that the state court characterized as an impairment of the obligation of the mortgage contract. *Id.*, at 420. Thus the question before this Court was whether this impairment contravened the contract clause. The Court in *Blaisdell* stated that " 'Nothing can be more material to the obligation than the means of enforcement. . . . The ideas of validity and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution.' " 290 U. S., at 430. While noting that a State's control over remedial processes is one justification for modification of the obligation of contract, *id.*, at 430–431, the Court

tractual promise that impairs the obligation of contract under federal law, any more than it is every alteration of existing remedies that violates the Contract Clause.

went on to note that the State possessed authority "to safeguard the vital interests of its people," *id.*, at 434, and its "economic interests," *id.*, at 437. "It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' *Stephenson* v. *Binford*, 287 U. S. 251, 276." *Id.*, at 434–435. Further the Court stressed that validity does not turn on whether the legislation "affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." *Id.*, at 438.

In *Veix* v. *Sixth Ward Building & Loan Association of Newark*, 310 U. S. 32, the Court upheld a state statute which restricted the contractual rights of investors in a building and loan association to withdraw and recover by suit the amount of their investment. No attempt was made to classify the measure as remedial. Rather the Court noted that the contract was with a financial institution of major importance to the credit system of the State and held that the "obligation of the Association to respond to an application for withdrawal was subject to the paramount police power." *Id.*, at 38. In upholding a statute disallowing a deficiency judgment where the value of the property bought by the mortgagee at a foreclosure sale equals the amount of the debt and interest in *Honeyman* v. *Jacobs*, 306 U. S. 539, the Court found the fact that the provision confined the creditor to securing a fair satisfaction of his debt determinative, notwithstanding that under the law in force when the contract was made the creditor could have recovered the difference between the price at the foreclosure sale and the amount of indebtedness. This holding was reaffirmed by a unanimous Court in *Gelfert* v. *National City Bank*, 313 U. S. 221, again without any regard to whether the measure was substantive or remedial. The Court held that the mortgagee's right under prior law to the advantages of a forced sale was not entitled to constitutional protection under the contract clause. *Id.*, at 234. Similarly in *East New York Savings Bank* v. *Hahn*, 326 U. S. 230, no notice was taken of the remedy-obligation distinction. Rather the Court upheld a moratory statute in postdepression times suspending for the tenth year in succession the mortgagee's right of foreclosure on the ground that contracts are not constitutionally immune from impairment by state measures designed "to safeguard the vital interests of its people." *Id.*, at 232.

*Stephenson* v. *Binford,* 287 U. S. 251, 276; *Stone* v. *Mississippi,* 101 U. S. 814, 819; *Manigault* v. *Springs,* 199 U. S. 473. Assuming the provision for reinstatement after default to be part of the State's obligation, we do not think its modification by a five-year statute of repose contravenes the Contract Clause.

The decisions "put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula," as Chief Justice Hughes said in *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 428. The *Blaisdell* opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that "[n]ot only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' *Stephenson* v. *Binford,* 287 U. S. 251, 276. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. . . . This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court." 290 U. S., at 434–435. Moreover, the "economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts." *Id.,* at 437. The State has the "sovereign right . . . to protect the . . . general welfare of the people . . . . Once we are in this domain of the reserve power of a State we must respect the 'wide discretion on the part of the legislature in determining what is and

what is not necessary.' " *East New York Savings Bank* v. *Hahn,* 326 U. S. 230, 232–233. As Mr. Justice Johnson said in *Ogden* v. *Saunders,* "[i]t is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts." 12 Wheat. 213, 291.

Of course, the power of a State to modify or affect the obligation of contract is not without limit. "[W]hatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Blaisdell, supra,* at 439. But we think the objects of the Texas statute make abundantly clear that it impairs no protected right under the Contract Clause.

## III.

Texas, upon entering the Union, reserved its entire public domain, one-half of which was set aside under the 1876 Constitution to finance a universal system of free public education.[10] These lands, over 42,000,000 acres,

---

[10] Texas Constitution, art. 7, § 2; Tex. Gen. & Spec. Laws 1935, ch. 312, § 2, Vernon's Ann. Civ. Stat., art. 5416.

"In order to perpetuate the dream of a universal system of free public education which was in the minds of most early Texans, the Constitution of 1876 provided that one-half of the Public Domain of the State, in addition to all funds, lands, and other property thereafter set apart for the support of the public schools, all the alternate sections of land reserved by the State out of grants made to railroads or to corporations, and all sums of money that may come to the State from the sale of any portion of the same, should constitute

were to be sold as quickly as practicable in order to provide revenues for the public school system and to encourage the settlement of the vast public domain. The terms of sale were undemanding and designed to accomplish the widespread sale and development of the public domain. The State required a down payment of one-fortieth of the purchase price, an annual payment of one-fortieth of principal and an annual payment of interest.[11] The terms were frequently modified in favor of purchasers. Periodically, during the course of almost a century, the time for payment of the nominal principal amount was extended.[12] In 1919, the requirement that the purchaser settle on the land or adjoining land was lifted,[13] provisions allowing forfeiting purchasers a first opportunity to repurchase forfeited land at a newly ap-

a perpetual school fund. The lands belonging to this fund were to be sold under such regulations as prescribed by law.

"Under these acts the Permanent Free School Fund has been granted more than 42,500,000 acres of land. The first sale of School Land was a 160-acre tract in Bowie County in 1874. Since 1905, the method of sale has been that of sealed competitive bidding, and most of the land making up this great endowment has now been sold and the sum of approximately $95,000,000 placed in the Permanent Free School Fund." Giles, History and Disposition of Texas Public Domain, 14–15 (1945).

[11] E. g., Tex. Gen. Laws 1895, ch. 47, § 9; Tex. Gen. Laws 1919, ch. 163, § 4. In 1941, the required down payment was increased from one-fortieth to one-fifth of the purchase price, and the amount of the annual payments was reduced from one-fortieth of the assessed price to one-fortieth of the unpaid balance. Tex. Gen. & Spec. Laws 1941, ch. 191, § 2, Vernon's Ann. Civ. Stat., art. 5312.

[12] E. g., Tex. Gen. & Spec. Laws 1941, ch. 191, § 1; Tex. Gen. & Spec. Laws 1951, ch. 59, § 1, Vernon's Ann. Civ. Stat., art. 5320a; Tex. Gen. & Spec. Laws 1961, ch. 399, § 1, Vernon's Ann. Civ. Stat., art. 5421c–9.

[13] Tex. Gen. Laws 1919, ch. 163, § 5, as amended by Tex. Gen. Laws 1925, ch. 130, § 3, Vernon's Ann. Civ. Stat., arts. 5306, 5311a.

praised value were thrice added,[14] interest in arrears was forgiven under one of these acts,[15] and reclassification of lands was held not to deprive forfeiting purchasers, upon reinstatement, of their mineral rights in the land.[16] But eventually the evolution of a frontier society to a modern State, attended by the discovery of oil and gas deposits which led to speculation and exploitation of the changes in the use and value of the lands, called forth amendments to the Texas land laws modifying the conditions of sale in favor of the State. Beside increasing the required down payment from one-fortieth to one-fifth of the purchase price,[17] the State restricted the right of reinstatement to the last purchaser from the State or his assigns and required that this right be exercised within five years from the date of forfeiture.

The circumstances behind the 1941 amendment are well described in the Reports of the Commissioner of the General Land Office. The general purpose of the legislation enacted in 1941 was to restore confidence in the stability and integrity of land titles and to enable the State to protect and administer its property in a

---

[14] 1938–1940 Report of the Commissioner of the General Land Office 12 (hereafter cited as Rep.). See also Tex. Gen. Laws 1925, ch. 94; Tex. Gen. Laws 1926, ch. 25, § 1, Vernon's Ann. Civ. Stat., art. 5326a.

Under the Act of April 18, 1913, forfeiture for nonpayment of interest did not empower the Commissioner to put land on the market again until after lapse of specific period during which the forfeiting purchaser was given a right to repurchase the tract. *Johnson* v. *Robison*, 111 Tex. 438, 240 S. W. 300.

[15] "Under the Reappraisement Act of 1913, forfeiting owners were allowed to repurchase their land at the reappraised value set by a board, and the accumulated delinquent interest on forfeited contracts was ignored." 1938–1940 Rep. 12.

[16] *Gulf Production Co.* v. *State*, 231 S. W. 124 (Tex. Civ. App.).

[17] Tex. Gen. & Spec. Laws 1941, ch. 191, § 2, Vernon's Ann. Civ. Stat., art. 5312.

businesslike manner. 1938–1940 Rep. 5. "[T]he records [of the land office] show that through the years many thousands of purchase contracts, covering, in the aggregate, millions of acres of school land, have been forfeited by failure of the purchasers to meet the small annual interest payments requisite to the maintenance of the contracts." *Id.*, at 11–12. In 1939, 15,000 sales contracts were found delinquent and subject to forfeiture and there were about 600,000 acres of unsold surveyed school lands, the major portion of which had produced no revenue for a decade. *Ibid.* This state of affairs was principally attributable to the opportunity for speculation to which unlimited reinstatement rights gave rise. Forfeited purchase contracts which had remained dormant for years could be reinstated if and when the land became potentially productive of gas and oil. Where forfeited lands were purchased without reservation of minerals to the State, as was the case in respect to early purchases before discovery of the extensive mineral wealth in the State, all of the mineral rights reverted to the owner of the reinstated claims, regardless of the State's later attempts in forfeited sales to share in the mineral interest. *Gulf Production Co.* v. *State,* 231 S. W. 124 (Tex. Civ. App.). Hence the Land Commissioner noted that the majority of sales and resales under the laws requiring sale to the highest bidder [18] were to purchasers buying a "speculative option," "taken for possible profits on the rights of the surface owners to lease the land for oil and gas." "Under such conditions lands were bid in at highly inflated prices such as no one who expected to keep the land could afford to offer." 1940–1942 Rep. 5. The attempts to assure some stability in land sales through

---

[18] Tex. Gen. Laws 1905, ch. 103, § 4; Tex. Gen. Laws 1919, ch. 163, § 6, Vernon's Ann. Civ. Stat., arts. 5313, 5314. *Giraud* v. *Robison,* 102 Tex. 488, 119 S. W. 1145.

repurchase acts, allowing delinquent owners a preferential right to buy forfeited land at a reappraised value, and, under one act, without payment of accumulated interest in arrears, proved unsuccessful, and expensive. In regard to one of the State's attempts to quiet titles through a repurchase act, the Land Commissioner in 1925 expressed the belief that the "owners can realize such returns from [the lands] as will enable them to pay interest thereon instead of continuing the recurring annual forfeiture and resale and so on indefinitely." 1924–1926 Rep. 5. In 1939, a new Commissioner noted that 1,872,326 acres had been forfeited and 1,195,993 acres repurchased under the three repurchase acts. The net loss to the School Fund from repurchases was said to be $1,661,980 plus the loss in interest arrears of $418,000. 1938–1940 Rep. 12.

No less significant was the imbroglio over land titles in Texas. The long shadow cast by perpetual reinstatement gave rise to a spate of litigation between forfeiting purchasers and the State or between one or more forfeiting purchasers and other forfeiting purchasers. See, e. g., *Weaver* v. *Robison,* 114 Tex. 272, 268 S. W. 133; *Anderson* v. *Neighbors,* 94 Tex. 236, 59 S. W. 543; *Mound Oil Co.* v. *Terrell,* 99 Tex. 625, 92 S. W. 451. Where the same land had been sold and contracts forfeited several times, as was frequently the case, the right to reinstate could be exercised by any one of the forfeiting purchasers or his vendees. *Hoefer* v. *Robison,* 104 Tex. 159, 135 S. W. 371. Cf. *Faulkner* v. *Lear,* 258 S. W. 2d 147 (Tex. Civ. App.). It was this situation to which the Texas Legislature addressed itself in 1941 and it is in light of this situation that we judge the validity of the amendment.

The Contract Clause of the Constitution does not render Texas powerless to take effective and necessary

514

measures to deal with the above. We note at the outset that the promise of reinstatement, whether deemed remedial or substantive, was not the central undertaking of the seller nor the primary consideration for the buyer's undertaking. See *Wilson* v. *Standefer*, 184 U. S. 399; *Waggoner* v. *Flack*, 188 U. S. 595; *Aikins* v. *Kingsbury*, 247 U. S. 484. Under this agreement the State promised to transfer title to the buyer upon his payment of the purchase price; in turn the buyer was obliged to make a nominal down payment of one-fortieth of the purchase price and to maintain annual interest payments. Where the buyer breached what was practically his only obligation under the contract, the land reverted back to the school fund, *Boykin* v. *Southwest Texas Oil & Gas Co.*, 256 S. W. 581, and a right of reinstatement arose, conditioned on the State's refusal or failure to dispose of the land by sale or lease. *Hoefer* v. *Robison*, 104 Tex. 159, 135 S. W. 371. We do not believe that it can seriously be contended that the buyer was substantially induced to enter into these contracts on the basis of a defeasible right to reinstatement in case of his failure to perform, or that he interpreted that right to be of everlasting effect. At the time the contract was entered into the State's policy was to sell the land as quickly as possible, and the State took many steps to induce sales. See *Becton* v. *Dublin*, 163 S. W. 2d 907, 910 (Tex. Civ. App.). Thus, for example, the Land Commissioner was required to reclassify forfeited lands by the next sale day and to publicize widely the forfeiture and sale. *Weaver* v. *Robison*, 114 Tex. 272, 268 S. W. 133. This policy clearly indicates that the right of reinstatement was not conceived to be an endless privilege conferred on a defaulting buyer. A contrary construction would render the buyer's obligations under the contract quite illusory while obliging the State to transfer the land whenever the purchaser decided to comply with the con-

tract, all this for a nominal down payment. We, like the Court in *Faitoute Iron & Steel Co.* v. *City of Asbury Park*, 316 U. S. 502, 514, believe that "[t]he Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' *Davis* v. *Mills*, 194 U. S. 451, 457."

The State's policy of quick resale of forfeited lands did not prove entirely successful; forfeiting purchasers who repurchased the lands again defaulted and other purchasers bought without any intention of complying with their contracts unless mineral wealth was discovered. The market for land contracted during the depression. 1938–1940 Rep. 12. These developments hardly to be expected or foreseen, operated to confer considerable advantages on the purchaser and his successors and a costly and difficult burden on the State. This Court's decisions have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change. *Honeyman* v. *Jacobs*, 306 U. S. 539; *Gelfert* v. *National City Bank*, 313 U. S. 221; *East New York Savings Bank* v. *Hahn*, 326 U. S. 230. Laws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract. The five-year limitation allows defaulting purchasers with a bona fide interest in their lands a reasonable time to reinstate. It does not and need not allow defaulting purchasers with a speculative interest in the discovery of minerals to remain in endless default while retaining a cloud on title.

The clouds on title arising from reinstatement rights were not without significance to the State's vital interest in administering its school lands to produce maximum revenue and in utilizing its properties in ways best suited to the needs of a growing population. The uncertainty

of land titles, the massive litigation to which this gave rise, and the pattern of sale and forfeiture were quite costly to the school fund and to the development of land use. Timeless reinstatement rights prevented the State from maintaining an orderly system of land sales and the resultant confusion impeded the effective disposition of lands and utilization of mineral wealth within them. Where sales by the State were not feasible or desirable, the State was prevented from utilizing the lands or permitting its subdivisions to utilize them by the possibility that some one of several purchasers might at some unknowable future date assert the right to reinstatement. In this very case, the legislature authorized by special act the transfer of this land to the City of El Paso, reserving the minerals to the State, in recognition of "[t]he fact that the City of El Paso is in urgent need of expanding its sources of water and of protecting water wells previously drilled," Tex. Gen. & Spec. Laws 1955, ch. 278. This transfer would have been invalid absent the 1941 Act.

The program adopted at the turn of the century for the sale, settlement, forfeiture, and reinstatement of land was not wholly effectual to serve the objectives of the State's land program many decades later. Settlement was no longer the objective, but revenues for the school fund, efficient utilization of public lands, and compliance with contracts of sale remained viable and important goals, as did the policy of relieving purchasers from the hardships of temporary adversity. Given these objectives and the impediments posed to their fulfillment by timeless reinstatement rights, a statute of repose was quite clearly necessary. The measure taken to induce defaulting purchasers to comply with their contracts, requiring payment of interest in arrears within five years, was a mild one indeed, hardly burdensome to the pur-

chaser who wanted to adhere to his contract of purchase, but nonetheless an important one to the State's interest. The Contract Clause does not forbid such a measure.

The judgment is

*Reversed.*

MR. JUSTICE BLACK, dissenting.

I have previously had a number of occasions to dissent from judgments of this Court balancing away the First Amendment's unequivocally guaranteed rights of free speech, press, assembly and petition.[1] In this case I am compelled to dissent from the Court's balancing away the plain guarantee of Art. I, § 10, that

"No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ,"

a balancing which results in the State of Texas' taking a man's private property for public use without compensation in violation of the equally plain guarantee of the Fifth Amendment, made applicable to the States by the Fourteenth, that

". . . private property [shall not] be taken for public use, without just compensation."

The respondent, Simmons, is the loser and the treasury of the State of Texas the ultimate beneficiary of the Court's action.

_____

[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U. S. Const., Amend. I. See, *e. g., Scales* v. *United States,* 367 U. S. 203, 259 (dissenting opinion); *In re Anastaplo,* 366 U. S. 82, 97 (dissenting opinion); *Konigsberg* v. *State Bar,* 366 U. S. 36, 56 (dissenting opinion); *Braden* v. *United States,* 365 U. S. 431, 438 (dissenting opinion); *Wilkinson* v. *United States,* 365 U. S. 399, 415 (dissenting opinion); *Barenblatt* v. *United States,* 360 U. S. 109, 134 (dissenting opinion); *Uphaus* v. *Wyman,* 360 U. S. 72, 108 (dissenting opinion); *Beauharnais* v. *Illinois,* 343 U. S. 250, 267 (dissenting opinion).

## I.

In 1910 Texas obligated itself by contract to sell the land here involved, the purchasers to pay one-fortieth of the price in cash, the balance due at unnamed dates, with annual interest at 3% of the unpaid balance to be paid each succeeding year. The contracts of sale approved on behalf of the State by the Texas Land Commissioner provided that the land was sold "in accordance with the provisions of" two Texas statutes.[2] The provisions of these statutes relating to the sale were thus incorporated in and became a part of the obligation assumed by Texas and the purchasers, just as if they had been spelled out word for word in the contracts. One of these incorporated statutes provided that upon failure to pay any interest due, a purchaser's rights under his contract should be "forfeited to the State," but that even after such forfeiture the purchaser could have his claim under the original contract

> "re-instated on . . . written request by paying into the Treasury the full amount of interest due on such claim up to the date of re-instatement, provided that no rights of third persons may have intervened." [3]

Some 37 years after execution of the contracts involved in this case, interest payments fell into arrears and the State declared the contracts forfeited. Five years and two days later Simmons, having become the owner of the contracts by valid sale and assignment, tendered payment of all interest due [4] and asked the State to carry out its

---

[2] Tex. Gen. Laws 1895, ch. 47; Tex. Gen. Laws 1897, ch. 129, as amended, Vernon's Ann. Civ. Stat., art. 5326.

[3] Tex. Gen. Laws 1897, ch. 129, art. 4218f, as amended, Vernon's Ann. Civ. Stat., art. 5326.

[4] The tender was received by the Texas Land Commissioner five years and two days after the forfeiture. The record does not indicate when or how the tender was sent or presented.

contractual obligation to reinstate his claim to the land. Since the State still owned the land and admittedly no rights of third persons had intervened, Simmons was unquestionably entitled to reinstatement of his claim under the terms of the State's original obligation. The State nevertheless refused to honor its contracts providing for reinstatement on tender of interest, and several years later sold the land, less mineral rights, to the City of El Paso for a price much higher than it would have received by honoring the contract and selling to Simmons at the contract price.[5] Simmons brought an action in federal court to establish his title. The Court of Appeals, reversing the District Court, held that the Contract Clause of the Constitution, Art. I, § 10, prevented Texas from thus repudiating the obligation it had assumed in its 1910 contracts.

This Court now reverses the Court of Appeals and holds that Texas was justified in dishonoring its contractual obligation because of a state law passed in 1941 which attempted to change the obligation of this contract and the many others like it from one unconditionally allowing reinstatement, provided no rights of third parties had intervened, to one which cast off that right unless "exercised within five (5) years from the date of the forfeiture."[6] The Court says that the State, after making a contractual obligation voluntarily and eagerly when the property was a drug on the market, was nevertheless free to enact the 1941 statute which not only impaired but flatly repudiated its former obligation after the land had greatly increased in value. And strange as

---

[5] The contract price for the 620.65 acres involved in this case was $1.50 per acre. The Texas Legislature in 1955 sold it to El Paso for the fair market value to be appraised, "but no less than $6.50 per acre." Tex. Gen. & Spec. Laws 1955, ch. 278.

[6] Tex. Gen. & Spec. Laws 1941, ch. 191, § 3, as amended, Vernon's Ann. Civ. Stat., art. 5326.

it sounds, one of the reasons the Court gives as justification for Texas' repudiation of its obligation to Simmons and many others is that these contracts had turned out to be a bad bargain and Texas had lost millions of dollars by honoring them in the past. If the hope and realization of profit to a contract breaker are hereafter to be given either partial or sufficient weight to cancel out the unequivocal constitutional command against impairing the obligations of contracts, that command will be nullified by what is the most common cause for breaking contracts. I cannot subscribe to such a devitalizing constitutional doctrine.

The Court does not deny that under Texas law the State's contractual promise to permit reinstatement gave the purchaser a right which the State under its law was bound by the contract to honor.[7] The Court carefully

_____

[7] I cannot agree with the Court's dictum that the Texas cases on this point are unclear. I do not think they could be much clearer. In *Gulf Production Co.* v. *State*, 231 S. W. 124, 131, the Texas Court of Civil Appeals said:

"The provisions for reinstatement were in effect when Kidd purchased the land, and were embraced in the contract between the state and Kidd when the latter purchased, and neither Kidd nor the state could thereafter arbitrarily and without the consent of the other write into the contract any provision or condition varying, restricting, or enlarging the terms thereof."

The court also observed:

"The primary object of the state in placing its public domain upon the market was the securing of actual settlers on these lands. The revenues to be derived from sales was but a secondary consideration, a mere incident to the greater purpose of supplying homes to those who sought and lived in them in good faith. The wisdom of this policy of our forefathers has never been seriously questioned, and the provision for the reinstatement of sales forfeited was an expression of the spirit of that policy. It was right and just that those who had settled upon and improved the state's lands in response to the invitation of the state, and who had endured the hardships incident to such settlement, and the privations incident to such improve-

does not deny that this promise by Texas is the kind of "obligation" which the Contract Clause was written to protect. The Court does not, unless by a most oblique reference in its footnote 9, nor could it in my judgment, allow Texas to escape its obligation by treating this as a mere change in court remedies for enforcement. Instead of relying on such grounds, the Court says that since the State acts out of what this Court thinks are good motives, and has not repudiated its contract except in a way which this Court thinks is "reasonable," therefore the State will be allowed to ignore the Contract Clause of the Constitution. There follow citation of one or two dicta from past cases and a bit of skillful "balancing," and the Court arrives at its conclusion: although the obligation of the contract has been impaired here, this impairment does not seem to the Court to be very serious or evil, and so therefore "The Contract Clause does not forbid such a measure."

## II.

In its opinion the Court's discussion of the Contract Clause and this Court's past decisions applying it is brief. For the most part the Court instead discusses the diffi- culties and regret which the Government of Texas has experienced on account of the contracts it entered. I therefore think that the first thing it is important to point out is that there is no support whatever in history or in

---

ment, should be given an opportunity to retrieve their lands when forfeited by reason of temporary misfortunes and the consequent inability to meet their payments in strict compliance with their obligations. Forfeitures by statute or contract are not favored. They must be viewed with a cold and literal scrutiny, that the injury wrought may be held to the minimum. On the other hand, statutes or contracts designed to relieve from the rigors of forfeiture are looked upon warmly and construed liberally, so as to afford the maximum relief. And this reciprocal rule applies as well to the great state of Texas as to its humblest citizen." 231 S. W., at 131. Cf. *State* v. *Walden,* 325 S. W. 2d 705 (Tex. Civ. App.).

this Court's prior holdings for the decision reached in this case. Indeed, I believe that the relevant precedents all point the opposite way.

The Contract Clause was included in the same section of the Constitution which forbids States to pass bills of attainder or *ex post facto* laws. All three of these provisions reflect the strong belief of the Framers of the Constitution that men should not have to act at their peril, fearing always that the State might change its mind and alter the legal consequences of their past acts so as to take away their lives, their liberty or their property. James Madison explained that the people were "weary of the fluctuating policy" of state legislatures and wanted it made clear that under the new Government men could safely rely on States to keep faith with those who justifiably relied on their promises. The Federalist, No. 44, at 301 (Cooke ed. 1961).

The first great case construing the Contract Clause involved, much like the present case, an attempt by a State to relieve itself of the duty of honoring land grants which it regretted having made. In *Fletcher* v. *Peck,* 6 Cranch 87, decided in 1810, this Court speaking through Chief Justice John Marshall held that a law of the State of Georgia which attempted to terminate grants of land made by the State under authority of a prior state law was invalid as a violation of the Contract Clause.[8] Later in *Sturges* v. *Crowninshield,* 4 Wheat. 122, decided in 1819, Chief Justice Marshall again speaking for the Court went on to say that "Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct," [9] thus drawing a distinction between state action deemed to

---

[8] *Fletcher* v. *Peck* also made clear that the Constitution forbids impairment of a contract whether the contract be executed or, as here, executory. 6 Cranch, at 136–137.

[9] 4 Wheat., at 200.

be a mere change of remedy, that is, the method for enforcing the contract, and state impairment of a contractual obligation.[10] As to the latter he emphasized that a thing promised to be done by a party to a contract is.

> "of course, the obligation of his contract. . . . Any law which releases a part of this obligation, must, in the literal sense of the word, impair it. . . .
>
> "The words of the constitution, then, are express, and incapable of being misunderstood." [11]

On other occasions this Court held that the Contract Clause prohibits a State from repudiating a tax exemption included by the State in a grant of land. *Gordon* v. *Appeal Tax Court,* 3 How. 133; *New Jersey* v. *Wilson,* 7 Cranch 164.

The Court does not purport to overrule any of these past cases, but I think unless overruled they require a holding that the Texas statute violates the Contract Clause. It is therefore at least a little surprising that the Court does not find it necessary to discuss them. Instead the Court quotes a few abstract statements from some other cases, hardly a solid and persuasive basis for devitalizing one of the few provisions which the Framers deemed of sufficient importance to place in the original Constitution along with companion clauses forbidding States to pass bills of attainder and *ex post facto* laws.

The cases the Court mentions do not support its reasoning. *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, which the Court seems to think practically read the Contract Clause out of the Constitution, actually did

---

[10] See also, *e. g., Honeyman* v. *Jacobs,* 306 U. S. 539, 542, and cases there cited; *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 430, 434, and cases there cited at n. 13; *Oshkosh Waterworks Co.* v. *Oshkosh,* 187 U. S. 437, 439.

[11] 4 Wheat., at 197–198.

no such thing, as the *Blaisdell* opinion read in its entirety shows and as subsequent decisions of this Court were careful to point out. *Blaisdell* without resort to "balancing" simply held that a State could constitutionally pass a law extending the period of redemption of a mortgage for two years where it provided for compensation to the mortgagee for the resulting delay in enforcement. In so holding the *Blaisdell* Court relied on and approved the established distinction between an invalid impairment of a contract's obligation and a valid change in the remedy to enforce it.[12] Viewed this way the Court

---

[12] The *Blaisdell* opinion said, 290 U. S., at 430:

"Chief Justice Marshall pointed out the distinction between obligation and remedy. *Sturges* v. *Crowninshield, supra,* p. 200. Said he: 'The distinction between the obligation of a contract, and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct.' And in *Von Hoffman* v. *City of Quincy, supra,* pp. 553, 554, the general statement above quoted was limited by the further observation that 'It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances.' "

Later, in *Honeyman* v. *Jacobs,* 306 U. S. 539, 542, Chief Justice Hughes, the author of *Blaisdell,* quoted with approval the following language from the opinion which he had joined in *Richmond Mortgage & Loan Corp.* v. *Wachovia Bank & Trust Co.,* 300 U. S. 124, 128:

"The legislature may modify, limit or alter the remedy for enforcement of a contract without impairing its obligation, but in so doing, it may not deny all remedy or so circumscribe the existing remedy with conditions and restrictions as seriously to impair the value of the right."

Chief Justice Hughes in the *Jacobs* case also referred to numerous past cases as having drawn this distinction, including among them

in *Blaisdell* found no contractual promise or "obligation" by the State to keep the old law as to remedy static. It could and did treat the challenged state law as a general one which did no more than change the remedy to enforce contracts, a change which had carefully provided that parties entitled under the old law to foreclose mortgages should during those two years be paid the fair rental value of the property just as if the foreclosure had taken place. In so holding the Court recognized that contracts are subject to the right of partial or total eminent domain, *West River Bridge Co.* v. *Dix*, 6 How. 507, so long as compensation is paid, and it held that since there was provision that the mortgagees would be paid the Contract Clause would permit such "limited and temporary interpositions" [13] designed to give "temporary relief" [14] through a "temporary and conditional restraint" on the remedy.[15] The Court noted that the mortgage contract was one between private persons rather than one between a private person and the State itself, and relied on past decisions which had held that "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349, 357. See also, *e. g.*, *Dillingham* v. *McLaughlin*, 264 U. S. 370, 374; *Marcus Brown Holding Co.* v. *Feldman*, 256

---

*Blaisdell.* See 306 U. S., at 542. He concluded that "[t]he reasoning of this Court in *Richmond Mortgage Corp.* v. *Wachovia Bank, supra,* is applicable and governs our decision." 306 U. S., at 543.

[13] 290 U. S., at 439.

[14] *Ibid.*

[15] *Id.*, at 440. Mr. Justice Brandeis in discussing *Blaisdell* the following year said that the statute in that case had been upheld because it had been found "to preserve substantially the right" of the mortgagee to obtain payment. *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555, 581. See also *id.*, at 597–598.

U. S. 170, 198; *Manigault* v. *Springs*, 199 U. S. 473, 480. The Contract Clause, said the Court in *Blaisdell*, would *not* be construed to "permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." 290 U. S., at 439. That, the Court held, would impair the contract instead of merely delaying enforcement while compensating the creditor for the delay. No such thing can be said about this Texas law, as the Court implicitly recognizes by placing no reliance upon the distinction between the obligation and the remedy, preferring instead its "balancing" technique.[16] Chief Justice Hughes, the author of *Blaisdell*, later reiterated and emphasized that that case had upheld only a temporary restraint which provided for compensation, when four months later he spoke for the Court in striking down a law which did not. *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426. Other state laws which did not meet the

---

[16] One scholar who made a study of all the decisions of this Court concerning the Contract Clause had this to say about *Blaisdell*:

"The Blaisdell case, in the light of subsequent decisions, appears now to have decided merely the very narrow question of the validity of the particular statute under the specific circumstances there existing. So far as any general rule may be said to have emerged, it is merely an apparently limited extension of the principle that reasonable modification of the remedy, especially if adequate time is left for compliance, does not constitute an impairment of the obligation of contracts. If any advance has been made, it consists in that economic conditions may create an emergency in which a scrupulously drafted statute may call upon the police power to grant wide discretion to courts in extending temporary and conditional relief to debtors." Wright, The Contract Clause of the Constitution, 119.

Compare the following language of Mr. Justice Brandeis in *Wright* v. *Vinton Branch*, 300 U. S. 440, 469:

"[I]t is urged that the limitations here placed upon the enforcement of the mortgage are not merely a modification of the remedy recognized as permissible. Compare *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 434."

constitutional standard applied in *Blaisdell* were subse-. quently struck down. See, *e. g., W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S. 56; *Treigle* v. *Acme Homestead Assn.,* 297 U. S. 189; *Wood* v. *Lovett,* 313 U. S. 362.[17]

None of the other cases which the Court quotes or mentions in passing altered in any way the rule established in *Fletcher* v. *Peck, supra,* and adhered to in *Blaisdell* and thereafter, that a State may not pass a law repudiating contractual obligations without compensating the injured parties.[18] Especially should this be true when, as in the

---

[17] I dissented in *Wood* v. *Lovett,* 313 U. S., at 372, because, as I there pointed out, I believed that the state law in that case, which protected purchasers of land against loss even though their titles were based only on quitclaim deeds, should have been upheld under *Blaisdell.* Even had my dissent prevailed, however, that case would not have supported the Court's holding in the case before us.

[18] None of the cases mentioned by the Court involved legislation by which a State attempted to repudiate its own contractual obligation without giving compensation, nor did any of them come near suggesting or implying that a State might do so. *Honeyman* v. *Jacobs,* 306 U. S. 539, in an opinion by Chief Justice Hughes, upheld a state statute providing that a mortgagee who bid at a foreclosure sale could not obtain a deficiency judgment if the value of the property equaled or exceeded the amount of the debt plus costs and interest; the Court said that the mortgagee under this law received all the compensation to which his contract entitled him, and that the statute "merely restricted the exercise of the contractual remedy . . . ." *Id.,* at 544, quoting from *Richmond Mortgage & Loan Corp.* v. *Wachovia Bank & Trust Co.,* 300 U. S. 124, 131. *Veix* v. *Sixth Ward Building & Loan Assn.,* 310 U. S. 32, held only that by issuing shares of stock at a time when state law permitted shareholders to withdraw their shares in exchange for a cash refund a private company regulated by the State could not prevent the State from applying later general legislation forbidding shareholders to sue for the withdrawal value; this rule of course had been recognized in *Blaisdell* and in cases which it cited, *e. g., Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, and *Manigault* v. *Springs,* 199 U. S. 473. *Gelfert* v. *National City Bank,* 313 U. S. 221, upheld a New York law which redefined fair market value of property purchased by mortgagees at foreclosure sales; again empha-

case before us, the contractual obligation repudiated is the State's own. Compare *Perry* v. *United States*, 294 U. S. 330, with *Norman* v. *Baltimore & O. R. Co.*, 294 U. S. 240.

### III.

To subvert the protection of the Contract Clause here, as well as the Fifth and Fourteenth Amendments' prohibition against taking private property for public use without just compensation,[19] the Court has, as I said, imported into this constitutional field what I believe to be a constitutionally insupportable due process "balancing" technique to which I have objected in cases arising under the Due Process Clauses of the Fifth and Fourteenth Amendments,[20] and which has done so much to water down the safeguards of First Amendment freedoms. See note 1, *supra.* The Court says, "Laws which restrict a party to those gains reasonably to be expected from the

---

sizing that contracts between private persons could not prevent application of general regulatory laws, the Court held that this law was merely a regulation of the remedy, and did not affect any substantial right given by the contract, relying on *Honeyman* v. *Jacobs*, 306 U. S. 539; *Richmond Mortgage & Loan Corp.* v. *Wachovia Bank & Trust Co.*, 300 U. S. 124; and *Blaisdell. Faitoute Iron & Steel Co.* v. *City of Asbury Park*, 316 U. S. 502, which upheld a law binding all the creditors of a municipal corporation to an adjustment of claims if 85% of them agreed, said simply that as a practical matter the law rather than impairing the creditors' contracts was necessary to keep them from becoming worthless. *East New York Savings Bank* v. *Hahn*, 326 U. S. 230, upheld a mortgage moratorium law much like that in *Blaisdell;* the Court pointed out that the law protected creditors from loss by requiring debtors to pay taxes, insurance, interest and installments on the principal, and again emphasized, citing *Manigault* v. *Springs, supra*, that private persons could not escape state economic regulatory legislation simply because they previously had entered contracts.

[19] See Part IV, pp. 533–535, *infra.*

[20] See, *e. g., Rochin* v. *California*, 342 U. S. 165, 174 (concurring opinion).

contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract." Otherwise stated, a person can make a good deal with a State but if it turns out to be a very good deal for him or a very bad deal for the State, the State is free to renege at any time. And whether gains can "reasonably be expected from the contract" is of course, in the Court's view, for this Court to decide. Thus this Court's judgment as to "reasonableness" of a law impairing or even repudiating a valid contract becomes the measure of the Contract Clause's protection.

The Court in its due process "reasonableness" formula, true to the principle of that indefinable standard, weighs what it considers to be the advantages and disadvantages to Texas of enforcing the contract provision, against the advantages and disadvantages to the purchasers. The Court then concludes that in its judgment the scales tip on the side of Texas and therefore refuses to give full faith to the constitutional provision. On the side of the purchasers the Court finds nothing that weighs much: the promise to reinstate was not "central" or "primary"; the contracts as viewed today seem to have been very generous to the buyers; buyers were probably not substantially induced to enter into these contracts by the "defeasible right to reinstatement." The Court tries to downgrade the importance of the reinstatement obligation in the contract by volunteering the opinion that this obligation "was not the central undertaking of the seller [Texas] nor the primary consideration for the buyer's undertaking." Why the Court guesses this we are not told. My guess is different. This particular provision was bound, I think, to have been a great inducement to prospective purchasers of lots and blocks of land that the State of Texas was understandably eager to sell for many reasons. It took purchasers to build up the population of Texas and thereby improve

its business and increase its land values. It is not surprising, therefore, that the State was willing to sell its oversupply of land on liberal terms, nor should it be surprising to suggest that Texas knew that its land could be sold for more, and more quickly, by promising purchasers that so long as Texas kept the property the right of these first purchasers and their assigns to buy at the original prices should never be forfeited. To my way of thinking it demonstrates a striking lack of knowledge of credit buying and selling even to imply that these express contractual provisions safeguarding credit purchasers against forfeitures were not one of the greatest, if not the greatest, selling arguments Texas had to promote purchase of its great surfeit of lands. The Court's factual inference is all the more puzzling since its opinion emphasizes that many people entered these contracts for speculative purposes which without the redemption provision would not have been nearly so attractive.

The Court observes that it believes "[t]he Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' " [21] Of course I agree with that. But while deprivation of Simmons' right to have Texas carry out its obligation to permit him to reinstate his claim and purchase the land may seem no more than a "theory" to the Court, it very likely seems more than that to Texas, which by repudiating its contract has undoubtedly gained millions of dollars, and to purchasers who have concededly, and I think unconstitutionally, lost those millions. It appears odd to me also to have the Court support its holding on what is nothing more than the Court's theory that all Texas has done is "technically alter an obligation of a contract." Much as has been said about the wealth of Texas, I was unaware until now

---

[21] Quoting *Faitoute Iron & Steel Co.* v. *City of Asbury Park*, 316 U. S. 502, 514, which in turn quoted *Davis* v. *Mills*, 194 U. S. 451, 457.

that a multi-million dollar windfall for that State could be dismissed as a mere technicality; it sounds like more than a technicality to me, and perhaps to the purchasers whose rights Texas took away from them.

Let us now look at some of the weights the Court throws on the scales on the side of Texas: thousands of purchase contracts were forfeited from time to time by failure of purchasers to pay interest; forfeited claims under many of these contracts could be reinstated by purchasers "if and when the land became potentially productive of gas and oil"; some of the purchases were made for speculative purposes; purchasers thwarted efforts of Texas to repurchase the lands in order to resell them at a higher value; the lands went up in value as the years rolled by, which caused Texas to "lose" millions of dollars; much litigation arose between the State and contract purchasers; the State's policy of quick resale of forfeited lands, in order to cause rights of third parties to intervene, did not prove successful; the market for land contracted during the depression; clouds on titles arose because of reinstatement rights on land which Texas had resold; "interest" and "necessity" prompted Texas to pass the 1941 law repudiating its contractual reinstatement rights; carrying out the obligations would have been "quite costly to the school fund and to the development of land use"; when the land here involved was sold to El Paso in breach of the State's obligation to Simmons, El Paso was " 'in urgent need of expanding its sources of water' "; the State needed more money for its school fund and for efficient utilization of its public lands, money which it could get painlessly if it was allowed to repudiate these obligations, which were "impediments" to the State's desire to raise money by reselling these lands for a higher price.

I do not believe that any or all of the things set out above on which the Court relies are reasons for relieving Texas of the unconditional duty of keeping its contrac-

tual obligations as required by the Contract Clause. At most the Court's reasons boil down to the fact that Texas' contracts, perhaps very wisely made a long time ago,[22] turned out when land soared in value, and particularly after oil was discovered, to be costly to the State. As the Court euphemistically puts it, the contracts were "not wholly effectual to serve the objectives of the State's land program many decades later. Settlement was no longer the objective, but revenues . . ." among other things were. In plainer language, the State decided it had made a bad deal and wanted out. There is nothing unusual in this. It is a commonplace that land values steadily rise when population increases and rise sharply when valuable minerals are discovered, and that many sellers would be much richer and happier if when lands go up in value they were able to welch on their sales. No plethora of words about state school funds can conceal the fact that to get money easily without having to tax the whole public Texas took the easy way out and violated the Contract Clause of the Constitution as written and as applied up to now. If the values of these lands and of valid contracts to buy them have increased, that increase belongs in equity as well as in sound constitutional interpretation not to Texas, but to the many people who agreed to these contracts under what now turns out to have been a mistaken belief that Texas would keep the obligations it gave to those who dealt with it.

All this for me is just another example of the delusiveness of calling "balancing" a "test." With its deprecatory view of the equities on the side of Simmons and other claimants and its remarkable sympathy for the State, the Court through its balancing process states the case in a way inevitably destined to bypass the Contract Clause and let Texas break its solemn obligation. As the Court's

---

[22] See *Gulf Production Co.* v. *State,* 231 S. W. 124, 131 (Tex. Civ. App.), quoted n. 7, *supra.*

opinion demonstrates, constitutional adjudication under the balancing method becomes simply a matter of this Court's deciding for itself which result in a particular case seems in the circumstances the more acceptable governmental policy and then stating the facts in such a way that the considerations in the balance lead to the result. Even if I believed that we as Justices of this Court had the authority to rely on our judgment of what is best for the country instead of trying to interpret the language and purpose of our written Constitution, I would not agree that Texas should be permitted to do what it has done here. But more importantly, I most certainly cannot agree that constitutional law is simply a matter of what the Justices of this Court decide is not harmful for the country, and therefore is "reasonable." Cf. *Ferguson* v. *Skrupa*, 372 U. S. 726; *Federal Power Comm'n* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 599 (concurring opinion). James Madison said that the Contract Clause was intended to protect people from the "fluctuating policy" of the legislature. The Federalist, No. 44, at 301 (Cooke ed. 1961). Today's majority holds that people are not protected from the fluctuating policy of the legislature, so long as the legislature acts in accordance with the fluctuating policy of this Court.

## IV.

In spite of all the Court's discussion of clouds on land titles and need for "efficient utilization" of land, the real issue in this case is not whether Texas has constitutional power to pass legislation to correct these problems, by limiting reinstatements to five years following forfeiture. I think that there was and is a constitutional way for Texas to do this. But I think the Fifth Amendment forbids Texas to do so without compensating the holders of contractual rights for the interests it wants to destroy. Contractual rights, this Court has held, are property, and

the Fifth Amendment requires that property shall not be taken for public use without just compensation. *Lynch v. United States,* 292 U. S. 571; see also *Perry v. United States,* 294 U. S. 330; cf. *United States v. General Motors Corp.,* 323 U. S. 373. This constitutional requirement is made applicable to the States by the Fourteenth Amendment. See *Griggs v. Allegheny County,* 369 U. S. 84, 85; *Pennsylvania Coal Co. v. Mahon,* 260 U. S. 393, 415; *Chicago, B. & Q. R. Co. v. Chicago,* 166 U. S. 226, 241. The need to clear titles and stabilize the market in land would certainly be a valid public purpose to sustain exercise of the State's power of eminent domain, and while the Contract Clause protects the value of the property right in contracts, it does not stand in the way of a State's taking those property rights as it would any other property, provided it is willing to pay for what it has taken. *Contributors to the Pennsylvania Hospital v. City of Philadelphia,* 245 U. S. 20; *City of Cincinnati v. Louisville & N. R. Co.,* 223 U. S. 390; *Long Island Water Supply Co. v. Brooklyn,* 166 U. S. 685; *West River Bridge Co. v. Dix,* 6 How. 507. The Texas statute which the Court upholds, however, took away Simmons' contract rights without any compensation.

The Court seems to say that because it was "necessary" to raise money and clear titles, Texas was not obligated to pay for rights which it took. I suppose that if Texas were building a highway and a man's house stood in the way, it would be "necessary" to tear it down. Until today I had thought there could be no doubt that he would be entitled to just compensation. Yet the Fifth and Fourteenth Amendments protect his rights no more nor less than they do those of people to whom Texas was contractually obligated. Texas' "necessity" as seen by this Court is the mother of a regrettable judicial invention which I think has no place in our constitu-

tional law.[23]   Our Constitution provides that property needed for public use, whether for schools or highways or any other public purpose, shall be paid for out of tax-raised funds fairly contributed by all the taxpayers, not just by a few purchasers of land who trusted the State not wisely but too well.   It is not the happiest of days for me when one of our wealthiest States is permitted to enforce a law that breaks faith with those who contracted with it.   Cf. *Federal Power Comm'n* v. *Tuscarora Indian Nation,* 362 U. S. 99, 124 (dissenting opinion).

I would affirm the judgment of the Court of Appeals.

---

[23] The Court's opinion bears an uncanny resemblance to one I once said I feared might be rendered some day if this Court continued to decide cases by "balancing."  See Black, The Bill of Rights, 35 N. Y. U. L. Rev. 865, 877–878, reprinted in Cahn ed., The Great Rights, 57–59.  I there said, evidently too optimistically, "Of course, I would not decide this case this way nor do I think any other judge would so decide it today."