364 So.2d 482 (1978)
STATE of Florida, DEPARTMENT OF TRANSPORTATION and Thomas E. Drawdy, Appellants,
v.
CONE BROTHERS CONTRACTING COMPANY, Appellee.
No. 77-1006.
District Court of Appeal of Florida, Second District.
September 6, 1978.
As Modified On Denial of Rehearing November 15, 1978.
*483 Jerrold K. Phillips, Tallahassee, Fletcher N. Baldwin, Gainesville, and H. Reynolds Sampson, Tallahassee, for appellants.
J. Rex Farrior, Jr., and Joseph G. Thresher of Shackleford, Farrior, Stallings & Evans, Tampa, for appellee.
OTT, Judge.
The case below and this appeal involves the validity of the legislature's retroactive amendment (Ch. 76-174, Laws of Florida) of a prior enactment (Ch. 74-262, Laws of Florida). The lower court ruled that the 1976 amendment was inapplicable. We disagree.
In 1974, the energy crisis caused petroleum prices to rapidly increase. This created a potentially catastrophic situation for road contractors, or their subcontractors and suppliers, who employed bituminous materials (asphalt) in the performance of binding road contracts. The Florida Legislature responded by enacting Section 337.143, Florida Statutes (1974) (Ch. 74-262, Laws of Florida). By this legislation the Department of Transportation (DOT) was directed to adjust the unit price of bituminous materials used in certain road construction contracts. The act was directed to apply to asphalt used after December 1, 1973 for use in "contract(s) for roadway construction for which bids were received ... prior to April 1, 1974... ." Thus, the legislation was directed at contracts for which bids had been accepted but where the contract work had either not commenced or was incomplete.
The preamble to the 1974 act detailed the need for and purpose of the legislation:
WHEREAS, the price of bituminous material has substantially increased during the past months due partly to the worldwide energy crisis, and the situation now and in the future appears to be very volatile and unstable, and WHEREAS, a contractor has no control over the rapidly increasing prices of bituminous material after he has successfully bid on a road construction project with the Department of Transportation, and after entering into binding contracts for the supply of bituminous material, and WHEREAS, the Department of Transportation has recognized this situation by adopting a specification providing for adjustment of the bid unit price for bituminous material which is applicable to contracts on which bids are received after April 1, 1974. The price adjustment activates upon a rise in the current asphalt price index ... applicable at the time bids were received for a project, and WHEREAS, contractors on projects for which bids were received by the Department of Transportation prior to April 1, 1974 will suffer irreparable economic harm and injury in performing their contracts upon the failure of the Legislature to enact this law, ...
Part (E) of the 1974 act authorized the DOT to extend an offer to all contractors with uncompleted contracts entered into prior to April 1, 1974 to amend the affected contracts so that asphalt prices would be adjusted on the basis of market prices instead of the fixed bid prices during the applicable period. Part (E) provided:
No adjustment shall be made to the contract unit price for bituminous material on any applicable contract unless a contractor agrees to the application of this adjustment for all applicable contracts he holds with the department. The department shall notify each contractor in writing by registered mail of his right to have this act apply to his contracts with the department. If a contractor fails to respond within 15 calendar days of such notice, no adjustment provided for in this act shall be made to any applicable contract.
The DOT, by letter of August 29, 1974, notified the appellee contractor of its "rights to have this act to apply to applicable contracts with the Department." On September 12, 1974 appellee returned (signed) a Letter of Agreement to Participate.
*484 Part (A) of the 1974 act set out the formula by which adjustments would be made. Part (A) provided as follows:
The adjustment shall be calculated separately for each month during which bituminous material is incorporated into a project, using the following formula:
Pa = Id + 5 cents where:
Pa = Adjusted unit price for bituminous material; and
Id = Department's Asphalt Price Index in effect during the month in which the material is incorporated into the project. The Department of Transportation shall determine the Asphalt Price Index by averaging quotations in effect on the first day of each month at terminals which could reasonably be expected to furnish bituminous materials to road construction projects in the State [of Florida].
With very minor exceptions, the Asphalt Price Index rose steadily from December 1973 through July 1975. The record reflects the following figures:

 MONTH INDEX
 December, 1973 0.1591
 January, 1974 0.1958
 February, 1974 0.2192
 March, 1974 0.2590
 April, 1974 0.2650
 May, 1974 0.2776
 June, 1974 0.2787
 July, 1974 0.2875
 August, 1974 0.2875
 September, 1974 0.2889
 January, 1975 0.2928
 February, 1975 0.2929
 March, 1975 0.2933
 April, 1975 0.2988
 May, 1975 0.2969
 June, 1975 0.2980
 July, 1975 0.3029

In mid-1975, the DOT realized that certain road contractors were making windfall profits under the provisions of the 1974 act. Accordingly, the DOT promulgated emergency regulations in July, September and October of 1975. The DOT contacted appellee and other contractors by letter asking them to participate under these emergency regulations. The appellee declined to do so, stating in its letter of July 28, 1975 that "[w]e hereby agree to the application of bituminous unit price adjustments, but only as defined by [the 1974 act]." The DOT then declined to make further payments under the 1974 act and appellee brought this action. The attempt of the DOT to correct this deficiency of the 1974 act by the promulgation of emergency rules was successfully challenged. See State Department of Transportation v. Pan American Construction Company, 338 So.2d 1291 (Fla. 1st DCA 1976).
The legislature acted in June 1976 with Ch. 76-174 amending Section 337.143, Florida Statutes.[1] Part (1) of the amendment stated as follows:
Recognizing that the unprecedented increase in the cost of petroleum products seriously affects a vital segment of the construction industry, legislative intent was, and is, to protect, by this act, said industry from irreparable economic harm and injury. It was not, and is not, legislative intent that any single contractor or group of contractors should receive excess or windfall profits to the detriment of the taxpayers, and the department shall take immediate steps to recoup any excess profits made since July 1, 1974. [Emphasis supplied.]
The method of calculation of the recoupment, etc. was set out in Parts (2)-(7) of the 1976 amendment. Part (3) (b) added the *485 requirement that the DOT "shall require documentation of actual costs paid prior to making any adjustments." Then in a new Part (4) the legislature spelled out the minimum and maximum increases any contractor could receive, based upon the actual costs paid by the contractor. Then, in Part (8) the following language appeared (the same as in Part (E) of the 1974 act, supra):
No adjustment shall be made to the contract unit price for bituminous material on any applicable contract unless a contractor agrees to the application of this adjustment for all applicable contracts he holds with the department. The department shall notify each contractor in writing by registered mail of his right to have this section applied to his contracts with the department. If a contractor fails to respond within 15 calendar days of such notice, no adjustment provided for in this section shall be made to any applicable contract.
In a letter to the DOT of June 7, 1976 the appellee stated:
Regarding the participation by our company for application of bituminous unit price adjustments this will advise that our company continues to maintain its position that it is entitled to payment in accordance with the original statutory formula contained in [the 1974 act].
The heart of appellee's contention is that the 1974 law (1) created a contract between appellee and the DOT, and (2) vested certain rights in appellee. Its argument is that subsequent legislation, i.e., the 1976 amendment, impaired the contract and abrogated vested rights.
While it may be arguable that a new contract was not effected by the 1974 act we are more persuaded that it was. Consequently, for our purposes we assume that a new contract was effected. More accurately, perhaps, the parties to a previous binding contract (each road contract) have mutually agreed (by the 1974 act  offer by the state  and its acceptance by the contractor) to a material revision of their pre-existing contract, namely, to change the calculation of the amount the state shall pay the road contractor (or his subcontractor or supplier) for asphalt.
The sovereign has a right to correct deficiencies such as those in the 1974 act. Appellee argues at the outset that the 1976 act should not be retroactively applied in the instant case since there was no plain intention by the legislature to do so. We do not agree. In Trustees of Tufts College v. Triple R. Ranch, Inc., 275 So.2d 521 (Fla. 1973) the supreme court stated:
"A statute is not to be given a retrospective effect, unless its terms show clearly that such an effect was intended.
The rule that statutes are not to be construed retrospectively unless such construction was plainly intended by the Legislature applies with peculiar force to those statutes the retrospective operation of which would impair or destroy vested rights." 275 So.2d at 525 citing In Re Seven Barrels of Wine, 79 Fla. 1, 17, 83 So. 627, 637 (1920).
In the Tufts College case the supreme court considered whether a 1970 statute that limited rights of entry in realty under mineral rights reservations to twenty years could be retroactively applied. The interest to be divested by a retroactive application was a vested property interest. The court held:
Since valuable vested rights may be destroyed by retrospective application of [the applicable statute], the rule that statutes will not be construed retroactively unless such construction was plainly and clearly intended by the Legislature applies with particular force to the construction of the [applicable statute]. 275 So.2d at 526.[2]
In the case sub judice the 1976 amendment of the legislature clearly and expressly provided for retroactive application to the 1974 enactment. The effect of the 1976 amendment was to engraft a requirement that the contractor demonstrate that he had *486 actually sustained a price increase as anticipated. We are therefore left with the fundamental question of whether such retroactivity was unconstitutional or invalid.
In McCord v. Smith, 43 So.2d 704, 708-09 (Fla. 1950) the supreme court held:
A retrospective provision of a legislative act is not necessarily invalid. It is so only in those cases wherein vested rights are adversely affected or destroyed or when a new obligation or duty is created or imposed, or an additional disability is established, in connection with transactions or considerations previously had or expiated.
A curative or remedial statute is necessarily retrospective in character and may be enacted to cure or validate errors or irregularities in legal or administrative proceedings, except such as are jurisdictional or affect vested substantive rights. 6 Fla. Jur. Constitutional Law § 264 (1956). In the supreme court's recent decision in Village of El Portal v. City of Miami Shores, Florida, 362 So.2d 275 (Case No. 51,233, Opinion filed May 31, 1978) the court dealt with the question of what is a vested right. The issue in the Miami Shores case was whether the statute there in question [§ 768.31, Fla. Stat. (1975), the Uniform Contribution Among Tortfeasors Act] adversely affected vested rights. In the process of reaching its ultimate conclusion the supreme court stated:
Remedial or procedural statutes do not fall within the constitutional prohibition against retroactive legislation and they may be held immediately applicable to pending cases ... [where the act] does not affect any vested rights . . or create any new obligations... . [at 278]
We think the 1976 act is remedial in nature rather than a modification of the substantive rights of the parties.
By its very terms the 1974 act limited the price adjustment, inter alia, to contracts covered by bids submitted prior to April 1, 1974, but covering asphalt work done or to be done after December 1, 1973; to price increases experienced prior to the expiration of the allowable contract time; to the contractors who agreed to the application of the adjustment to all applicable contracts and to pay the entire amount of the resulting additional compensation to any subcontractor who actually performed the asphalt work. The 1976 act  in keeping with the express reason for and objective of the 1974 act  added a further narrowing condition: where the contractor can actually demonstrate a minimum advance of his cost of asphalt. We point out that the substantive provisions of the 1974 act, including price adjustment formula, remained unchanged.
By the 1974 act the state bailed out the contractors by providing relief from an unexpected and potentially catastrophic development. By the 1976 act the state acted to prevent or decrease any unintended windfall; confining the relief to those situations  road contracts  wherein modification of an already binding contract was truly justified.
With reference to impairment of contract, in United States Trust Company of New York v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) the Court held with reference to the Contract Clause:
The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. 431 U.S. at 25, 97 S.Ct. at 1519, 52 L.Ed.2d at 111-12.
In United States Trust Co. the facts were as follows. The states of New York and New Jersey had, in 1962, entered into a statutory covenant which limited the ability of the Port Authority of New York and New Jersey to subsidize rail passenger transportation from revenues and reserves pledged as security for consolidated bonds issued by the Port Authority. A 1974 New Jersey statute, together with a concurrent and parallel New York statute, retroactively repealed the 1962 covenant.
The Court held that the 1962 statutory covenant had been impaired. The Court based its holding on several factors. It *487 pointed out that the bond holders had been harmed by the retroactive legislation in the sense that the outright repeal of the 1962 covenant totally eliminated an important security provision and thus impaired the obligation of the state's contracts. The Court noted that it was aware of the laudable goals underscoring the retroactive legislation, i.e., mass transportation, energy conservation and environmental protection. While pointing out that it realized that these were important and legitimate matters of public concern, the Court held that "a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors." 431 U.S. at 29, 97 S.Ct. at 1521, 52 L.Ed.2d at 114.
The facts in the instant case are much different than those found in United States Trust Co. In the first place, the nature of the contractual relationship is entirely different. In United States Trust Co., the state had obligated itself financially in a municipal bond contract. In contrast, our statutory "contract" (under the 1974 act) was, in simple terms, a "contractor's relief act." In the present case the State of Florida, rather than obligating itself financially as in the case of a bond situation, was more in the nature of a grantor of social welfare funds. The legislature's response to the embargo and rapidly escalating petroleum prices was not really all that much different from other social welfare legislation. The legislature decided that contractors, subcontractors and suppliers were truly exposed to a real danger of irreparable economic harm on public works contracts falling within the narrow time frame established by the 1974 act.
The instant case fits under the rule that "an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." 431 U.S. at 25, 97 S.Ct. at 1519, 52 L.Ed.2d at 111-12. It is illogical to assume that the legislature, by enacting the 1974 act, was irrevocably and forever frozen to the precise terms and conditions of qualification provided therein. The state could have done nothing and forced the contractors to either take the losses or default. The state didn't do this and provided relief through the 1974 act. It is surely reasonable and necessary to protect the taxpayers by amending the original law to recoup or prevent unintended excess profits by the contractors.
We find City of El Paso v. Simmons, 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446, 458 (1965) most apropos. In that case a 1910 statute directing sale of public lands on long-term liberal contracts had unforeseen effects which allowed speculators to reap windfall benefits at the expense of the State of Texas. By a 1941 amendment the legislature of the State of Texas sought to limit and sharply curtail such possibilities. In holding the 1974 amendment valid the United States Supreme Court stated:
This Court's decisions have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change.
.....
Laws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract.
Appellee argues that two other cases apply in support of their argument that their 1974 contract was impaired by the 1976 amendment. Appellee argues that Anders v. Nicholson, 111 Fla. 849, 150 So. 639 (1933) is directly on point. The facts in Anders are clearly distinguishable from those here under consideration.
Anders involved pension funds for city employees in Jacksonville. A 1919 statute created the pension plan. Participation was voluntary and the act provided that any employee-member of the fund, upon discharge, would receive all the monies contributed by him plus interest at 4% per annum. Thereafter, however, the legislature  in 1925  amended the plan and provided that an employee, upon discharge, would only be eligible to receive 50% of the funds contributed by him during the period *488 of his employment. The court held [citing the New Jersey case of Ball v. Board of Trustees of Teachers' Retirement Fund, 71 N.J.L. 64, 58 A. 111 (1904)] as follows:
The fact that the terms of the agreement were embodied in an act of the Legislature does not change its essential character as a contract, and it was beyond the power of the Legislature to impair the obligation of this contract by subsequent legislation. 150 So. at 644 citing 58 A. at 112.
Very important to the Anders court was the fact that the pension fund was made up of voluntary contributions of employees made under clear conditions and expectations. A far different situation would have been presented had the pension fund involved only public monies. Appellee's contention that "in both cases [here and Anders] there was an existing obligation on the part of the government unit which was modified by legislation ..." is overly simplistic. The reason for finding an impairment of contract in Anders was to rectify a grossly unfair taking of employee contributions by the 1925 law. In our case, instead of voluntary contributions to a pension plan being swept away by legislative fiat, we have a situation where the likelihood of windfall profits to a contractor under a contractor's relief act was at least attempted to be diminished by amendment.
We also think appellee's reliance on Forbes Pioneer Boat Line v. Board of Commissioners of Everglades Drainage District, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922) rev'g 80 Fla. 252, 86 So. 199 (1920) is misplaced. In Forbes the Florida Legislature attempted to retroactively validate  by statute  tolls for passage through canal locks. The tolls had been set and collected by the Board of Commissioners of the particular drainage district [an agency of the state] without such being authorized by the original act. The legislation was enacted on the same day that the Florida Supreme Court decided the case. The plaintiff boat line had paid the tolls for three years and sued to recover them back. Forbes did not involve a right premised upon a prior existing and lawful contract as modified by subsequent legislation. The simple holding in Forbes was that the state legislature may not retroactively create a new liability in the absence of just compensation.
Appellee makes much of the supposed "two-way" nature of the 1974 act. Appellee summarizes this argument as follows:
When the agreement [1974] was entered into switching to a variable price, the state stood to gain if the monthly price fluctuation averaged out lower than the various fixed bids under the respective contracts.
The recent case of State of Florida, Department of Transportation v. Edward M. Chadbourne, Inc., 358 So.2d 605 (Fla. 1st DCA 1978) agreed with this argument. Chadbourne is a case involving facts almost identical to those in the instant case. The Chadbourne court accepted the "two-way" argument:
[F]ixing payment according to a monthly asphalt price index is a double edged sword. At the time [the 1974 act] was enacted prices were volatile and unstable, capable of dropping abruptly should the oil embargo have failed. The statute then would have operated to the benefit of the state should asphalt prices have plunged. [Emphasis supplied.] 358 So.2d at 608.
This is a highly unlikely reading of history and requires us to ignore the preambles of the acts in question. As pointed out by the dissent in Chadbourne "the possibility of a drop in oil prices so low that payments would dip below the original price bid is remote indeed." 358 So.2d at 608. We add that if such a result were at all likely it is very doubtful the legislation would have ever been proposed or, if proposed by DOT, would have passed the legislature. Similarly, if enacted, it would hardly have commended itself to the contractors' "acceptance". If the 1974 act had been passed to increase  or had the strong likelihood of increasing  the profit of either the contractors or the state then it seems to us that its validity would be in serious jeopardy.
*489 The rationale of the majority in Chadbourne on this point does not commend itself to us. That court held:
[T]he legislature could not have forced Chadbourne to accept the terms of the 1974 statute, for to do so would be contrary to the United States and Florida Constitutions as an impairment of a valid and existing contract. Chadbourne chose, however, to participate, taking the good with the bad. The trial judge construed the 1976 amendment as again giving contractors a choice. We agree. Since Chadbourne did not elect to participate, his payment must be determined under the 1974 act. Having elected to participate under the 1974 act, but having exercised his right not to participate under the 1976 act, the latter did not affect the contracts which were submitted pursuant to the 1974 act prior to the enactment of the 1976 act. 358 So.2d at 607.
This would seem to indicate that the contractors are afforded three options (as argued by appellee herein):
1. Return to the pre-1974 law position;
2. Retain the application of the defective 1974 "windfall" formula;
3. Elect the curative 1976 formula amount.
We are more inclined to believe that the contractor has but two options:
1. Elect to continue its participation in the asphalt price adjustment pursuant to the 1976 qualifying requirements (the actual price adjustment formula was not changed by the 1976 act).
Note: This allows the contractor to review established financial data and criteria to make an intelligent election as to which option is financially preferable.
2. Return to or stand on his pre-1974 act contract by simply rejecting the program.
Appellee points to the deposition of Drawdy in which Drawdy [of the DOT] made a supposedly damaging admission that the 1974 act was a "two-way clause." Taken out of context, this is a valid contention. However, in context, Drawdy is merely admitting what is possible, not probable. What the majority in Chadbourne and appellee in its brief maintain as a two-way street was in reality a one-way street with only an extremely remote, if not nonexistent, possibility of the state deriving a profit  much less a windfall.
Appellee also seeks to make much of the "offer" and "acceptance" language of both acts as thereby creating  at least by the 1974 act  a new unimpairable contract between the parties. We think the "offer" and "acceptance" language is not determinative of the question. It seems to us that the legislature intended to "offer" relief only to those contractors or subcontractors who incurred the contemplated increase and needed relief  otherwise the contractor would have no need to "accept" and, in fact, it would be unconscionable to do so. The legislature therefore provided in both acts that the "added compensation" would be payable to "the subcontractor who performed the asphalt work on the project" clearly having in mind that price increases were inevitable and that the "additional compensation" would actually go to the party experiencing such increases. Windfall or excess profits would obviously occur if the contractor is permitted an adjustment in the price he is paid according to the statutory formula and yet has assured his supply of asphalt under the affected contracts at pre-crisis prices. Perhaps the real significance of the "offer" and "acceptance" provisions was to provide a basis for enforceability by those contractors who "accepted" the state's "offer" and relied thereon to their prejudice. No such showing is attempted by appellee. It simply stands on the flat premise that a new contract was created by the 1974 act that could not be modified, in any way, by the 1976 legislative enactment unless the contractor so chose.
We hold that the 1976 act was a valid retroactive amendment to the 1974 act. Its purpose and effect is to specify the criteria to qualify for the intended relief and limits its availability to such as demonstrate a real or genuine need.
*490 We realize that our holding places us in direct conflict with our sister court's holding in Chadbourne, supra. Further in view of the widespread nature of the problem, its public significance and the need for speedy resolution of the legal status of the state and the numerous road contractors under the 1974 and 1976 legislation we certify the case to the supreme court for determination.
Reversed and remanded for further proceedings not inconsistent therewith.
SCHEB, J., concurs.
GRIMES, C.J., dissents with opinion.
GRIMES, Chief Judge, dissenting.
The result accomplished by the majority opinion is appealing because it incorporates into the 1974 act the 1976 safeguards against windfall profits which the legislature would have surely passed in 1974 had the matter been considered at that time. Nevertheless, I cannot rationally overcome what the majority characterizes as the "two way" nature of the 1974 act. Under this legislation the contractors were given the option of having their payments for paving work under existing contracts based upon the current asphalt price index. If a contractor chose to accept this method of price calculation he was bound to it regardless of whether he ultimately received more or less than his original contract price. While the asphalt index price did go up as everyone expected, there were instances in which by virtue of having accepted the new formula some contractors were paid less than they would have been under their original contracts. This occurred with respect to one of the three contracts in issue in State of Florida, Department of Transportation v. Edward M. Chadbourne, Inc., supra. Thomas E. Drawdy, Department of Administration Estimates Engineer, confirmed this when he testified on deposition:
Q There are cases where the asphalt price index system when applied to the formula resulted in less compensation than the original fixed bid price?
A This is correct.
The impairment of contract involved in this case is best illustrated by assuming that the 1974 act had not been passed but that the asphalt price formula included therein was a part of the appellant's original contracts with the Department of Administration. Then assume that in 1976 the legislature passed a statute specifying that any existing contracts having such an asphalt price formula would be changed to the extent that the payment must be tied to actual costs. I have little doubt that under these circumstances the 1976 legislation would be construed as an unconstitutional impairment of the pre-existing contracts. The only way that the instant case differs from the hypothetical set of facts is that the asphalt price formula was incorporated into the existing contracts by virtue of the option offered under the 1974 legislation. Under both circumstances, there were valid contracts which provided that the payments would be computed according to the asphalt price formula, and the 1976 act seeks to alter this formula.
In my judgment, the majority may be more willing to conclude that the 1976 amendment is not an impairment of contract because of the fact that when oil prices started rising the state could have held the contractors to their original fixed bid contracts, and the 1974 legislation was enacted to help them weather an unforeseen hardship. As persuasive as this may be, I don't think this provides us with a basis upon which we can apply the legal doctrine of impairment of contract in different ways. It does draw into issue the question posed by the dissent in Chadbourne of whether the 1974 act was constitutional in the first place. As did the majority in Chadbourne, I believe the 1974 act was constitutional because there was a substantial state benefit in seeking to avoid a total breakdown in road building due to the potential bankruptcy of paving contractors and because of the possibility that the monies paid out on the new asphalt price index formula would be less than the original contract price. The constitutionality of the 1974 act was also argued before us, but *491 because of the disposition of the case it was unnecessary for the majority to reach it.
In essence, the majority seems to be construing the 1974 act as if it had always contained the limiting provisions of the 1976 amendment, but this is not so. I cannot escape the conclusion that to apply the provisions of the 1976 amendment to those paving contracts which had been agreed upon as being governed by the 1974 price index formula constitutes an unconstitutional impairment of contract.
Therefore, I respectfully dissent.
NOTES
[1] The 1976 amendment was enacted (effective June 18, 1976) prior to the decision in Pan American (opinion filed October 18, 1976). The appellee contends that the Pan American decision is dispositive of "all of the same arguments which [the DOT] raises on this appeal." This, however, is not the case. Pan American was a narrow decision. Its treatment of the 1976 amendment was limited to the question of timing, i.e., did the 1976 amendment and accompanying rules preclude judicial construction of the 1974 law and the rules promulgated thereunder by the DOT. On this question, the First District Court of Appeal ruled against the DOT, holding that respondent contractors were entitled to construction of the prior law and rules.
[2] The supreme court recently reiterated the "bias against retroactive legislation" in the absence of legislative intent to the contrary. Century Village, Inc. v. Wellington E, F, K, L, H, J, M & G Condominium Ass'n, 361 So.2d 128 (Opinion filed July 13, 1978).